**LOUISVILLE & NASHVILLE RAIL-ROAD CO.**

v.

Austin P. CANTRELL et al.

Lawson S. ARCHEY et al.

v.

**LOUISVILLE & NASHVILLE RAIL-ROAD CO.**

**LOUISVILLE & NASHVILLE RAIL-ROAD CO.**

v.

W. C. HENRY et al.

Civ. Nos. 2867, 2891, 2931.

United States District Court
M. D. Tennessee,
Nashville Division.

Jan. 11, 1962.

230

Walter Harwood and Judson Harwood, of Harwood, Breedlove & Mittwede, Nashville, Tenn., for plaintiff.

David Keeble, of Hooker, Keeble, Dodson & Harris, Nashville, Tenn., and H. G. Breetz, Louisville, Ky., for defendants.

WILLIAM E. MILLER, Chief Judge.

Louisville & Nashville Railroad Company v. Cantrell, Civil Action 2867, is a declaratory judgment action instituted by the plaintiff for a judicial determination as to the method to be followed for arbitrating the claims of the defendants growing out of the merger of the Louisville and Nashville Railroad Company and Nashville, Chattanooga and St. Louis Railway. The action involves the same group of employees as involved in the cases of Arnold and others v. Louisville & Nashville Railroad Company, decided by this Court and reported in D.C., 180 F.Supp. 429, in addition to some twenty other employees, all employees occupying the same status as far as the legal issues here presented are concerned. In those cases it was held that the Court was without jurisdiction to adjudicate the claims of the employees for the reason that they were required to resort to arbitration, whether their claims be considered as deriving from the Interstate Commerce Commission's order, or from the implementing agreement. It is the plaintiff's insistence that the proper method for arbitration is the procedure provided for in the implementing agreement which was made and entered into by and between the plaintiff and a labor union as a representative of the employees. On the other hand, the defendants insist first, as they

did in the Arnold cases, that the Court has jurisdiction of their claims and that they are not bound by the terms of the implementing agreement. They further insist that if they are required to arbitrate, each individual employee has the right to designate his own representative to negotiate with the railroad to establish the proper method or machinery for arbitration. Before considering the basic issue in the case, a preliminary question of jurisdiction must be determined. Diversity of citizenship is duly established by the record but the defendants question whether the requisite jurisdictional amount is involved.

A substantial number of the employees have elected to take a lump sum settlement and it appears from the record that the settlement in the case of each individual employee would be in an amount less than $10,000. Other employees who have not made such election, or who made the election and later withdrew it, claim the monthly dismissal or coordination allowance which, without reduction, would cause their respective claims to exceed the jurisdictional amount of $10,000. However, the defendants insist that in the case of such employees their dismissal or coordination allowance must, under the Commission's order, be reduced to the extent that they receive compensation from other employment and further to the extent that they receive unemployment compensation.

■■ The liability of the plaintiff to the defendants being a several and not a joint liability, the claims cannot be aggregated for jurisdictional purposes, and the action may be sustained only with respect to those employees whose claims individually involve the requisite jurisdictional amount. 1 Moore's Federal Practice, p. 888. The test for determining the amount in controversy is the value to the plaintiff of the right he is seeking to protect. 1 Moore's Federal Practice, p. 827. But the jurisdictional amount is determined by the claim and not by the actual amount awarded. Collier v. Leedom Const. Co., D.C., 84 F. Supp. 348. " * * * When it is neces-

sary, in order to ascertain the amount involved in controversy, to consider conflicting testimony, or to decide disputed questions of law, this necessity alone gives the court jurisdiction. The court, under such circumstances, must hear the case, and reach its conclusion judicially; in other words, must take jurisdiction." Stillwell-Bierce & Smith-Vaile Co. v. Williamston Oil & Fertilizer Co., 80 F. 68, 69. As stated by the Supreme Court, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845.

■ The plaintiff, although insisting that the implementing agreement governs the employees' rights, denies that they have ever been entitled to lump sum settlements under the Commission's order, assuming arguendo that the order governs such rights rather than the agreement. The contention is that such method of settlement comes into effect only after there has been a finding that the dismissal allowance under the Oklahoma conditions does not afford the employee the minimum four-year statutory protection. It is further insisted by the plaintiff that the employees have not made a timely election to accept a lump sum settlement at the time they were first adversely affected. Such an election is required both by the terms of the implementing agreement and the terms of the Commission's order. Thus, regardless of whether the employees' rights are founded upon the Commission's order or the implementing agreement, the election to accept the lump sum benefits must be timely. The notices of the election in the present case were from two to five months after the date of the employees' separation from employment and hence one issue involved is whether the election was timely. If it should be determined that the election was not timely, the employees would be barred from taking benefits under the lump sum provision. Further, the plaintiff insists that the employees, having made their elections, are

free to withdraw them at any time before final determination of their claims inasmuch as there has been no acceptance of the offers by the plaintiff. It is clear to the Court, therefore, that both issues of law and of fact are presented relative to the validity and effectiveness of the elections to accept a lump sum settlement, with the result that as to these claims the requisite jurisdictional amount is involved. This is true for the reason that if the elections should be held to be ineffective, the employees would be relegated to the coordination allowance which potentially exceeds $10,-000 in the case of each employee. The defendants contend that the plaintiff's potential liability for payment of the coordination allowance must be considered as reduced to the extent of each employee's monthly earnings in other employment or by any benefits under any unemployment insurance law. On this basis, it is insisted that the several claims are reduced below the jurisdictional minimum of $10,000. This argument appears, however, to be without merit. The Railroad Unemployment Insurance Act conditions the benefits to be paid on days of unemployment. 45 U.S.C.A. § 352. The Act further provides that a "day of unemployment" shall not include any day on which remuneration is payable or accrues to the employee, the term "remuneration" meaning pay for services for hire. 45 U.S.C.A. § 351(j, k). Coordination or dismissal allowance resulting from abandonment or coordination of unemployment facilities is remuneration within the meaning of the Act. 20 C. F.R., Sec. 322.7. It thus clearly appears that the employees who received the coordination or dismissal allowance are not entitled to unemployment compensation under the Railroad Unemployment Insurance Act. If such compensation benefits are paid to an employee and it is later determined that remuneration, such as the coordination allowance, is payable to such employee for any period for which any compensation benefits were paid, the remuneration so payable is required to be held in a special trust fund for the Rail-

road Retirement Board to the extent of the compensation benefits paid. 45 U.S. C.A. § 352(f). Therefore, the defendants are not entitled to retain unemployment compensation for any period that they are determined to have been entitled to monthly protective benefits. When and if the latter payments are required to be made to such employees, the railroad is obligated to withhold an amount equal to the amount of unemployment compensation received by each employee and to return it to the Railroad Retirement Board. 45 U.S.C.A. § 352(f). Consistently with these provisions of the Act, the plaintiff's total potential liability cannot be considered as being reduced by payment of unemployment benefits.

■ Defendants' further insistence that outside earnings received by the employees should be taken into account in reducing the railroad's total liability below the jurisdictional amount, fails to recognize that the amount in controversy is ascertained without reference to events occurring subsequent to the institution of the action which might possibly reduce the amount in controversy below the statutory limit. It was so held in Aetna Casualty & Sur. Co. v. Flowers, 330 U.S. 464, 67 S.Ct. 798, 91 L.Ed. 1024, in which it was held that the possibility that future disability payments under a disability insurance policy may be cut off did not reduce the claim below the jurisdictional minimum. The affidavit of Walter Harwood, relied upon by the employees as evidence of outside earnings after the time of their dismissal until the institution of the present action, sets forth no facts indicating that the outside income was earned during such period and no facts upon which any ascertainment of the actual earnings of the employees can be based, the affidavit being made on information and belief.

Since the ultimate liability of the plaintiff could be found to be in excess of $10,000, the Court is of the opinion that it has jurisdiction of the action.

■ On the merits, the Court is of the opinion that the arbitration procedure

by which the parties are bound is the procedure provided for in the implementing agreement. As pointed out in Arnold v. Louisville & Nashville Railroad Company, supra, it was the clear intention of the Interstate Commerce Commission that disputes of this nature should be settled by arbitration. The machinery for arbitration, however, was not prescribed or spelled out by the Commission, the order simply providing that the formation of the committee and its duties, procedure, expenses, etc., "shall be agreed upon by the carrier and the employee, or his duly authorized representatives". The implementing agreement itself, pursuant to the order of the Commission, provides for the establishment of the arbitration board and its duties, procedures, expenses, etc. The agreement was in fact negotiated and executed by the plaintiff and by the "duly authorized representative of the employees," being the labor union certified as the bargaining representative of the employees under the Railway Labor Act. Furthermore, as pointed out in Arnold v. Louisville & Nashville Railroad Company, supra, the Interstate Commerce Act itself specifically reserves to the carrier and "the duly authorized representative or representatives of its or their employees" the right to enter into an agreement "pertaining to the protection of the interests of said employees." 49 U.S.C.A. § 5(2)(f). The agreement, providing the method of arbitration, clearly pertained "to the protection of the interests" of the employees, and the Court is of the opinion that it was authorized both by the Interstate Commerce Commission's order and by the Interstate Commerce Act, that it is binding upon the railroad and the employees; and that the arbitration procedure to be followed is the procedure prescribed in the agreement itself.

Archey et al. v. Louisville & Nashville Railroad Company, Civil Action No. 2891, is an action by another group of railroad employees to have their claims growing out of the merger adjudicated by the Court; and Louisville and Nashville Railroad Company v. W. C. Henry et al., Civil Action No. 2931, is an action by the railroad for declaratory judgment as to the method to be followed for arbitrating the claims of the employees involved in the Archey case.

The same issue with respect to the requisite jurisdictional amount is involved in the Henry case as in the Cantrell case, supra; and the Court is of the opinion for the same reasons set forth in the Cantrell case that the jurisdictional amount is present and that the Court has jurisdiction.

■ There is only one principal difference between the facts in the Archey and Henry cases (2891 and 2931) and the facts presented in the Cantrell case (2867). In the Cantrell case (and also in the Arnold cases previously decided, 180 F.Supp. 429) the implementing agreement was executed in January 1958, prior to the time the employees were actually adversely affected by the merger by being separated from employment, but after the date of the Commission's order of August 14, 1957 approving the merger. In the Archey and Henry cases, however, the implementing agreements were not executed until October 18 and 19, 1961, a few days before the hearing on October 24, 1961. Thus the implementing agreements with the union were entered into some two to two and one-half years after the employees were separated from service, a year and one-half after the demand was made on the railroad for benefits, and some sixteen months after the employees filed their action in this Court. The determinative question in both the Archey and Henry cases is whether these implementing agreements are binding upon the employees with respect to the method of arbitration to be followed. The employees contend that such agreements are not effective or binding upon them; that the employees had already been adversely affected by separation from employment and that their rights had already accrued; and that if the union was ever authorized to negotiate an arbitration procedure for them, it was not authorized to do so after such separation. It is further insisted that the implementing

agreements are inconsistent with the degree of protection afforded the employees by the order of the Interstate Commerce Commission. The railroad argues, on the other hand, that the Commission's order constitutes a mandate that the procedures to be used in case of a dispute would have to be provided for by the railroad and the duly authorized representative of the employees, or in the alternative, that the order of the Commission was permissive in this respect, giving the railroad and the union the right to contract for all employees. The railroad further contends that the implementing agreements did not impair any accrued rights of the employees, but merely provided a remedy to be followed to determine the employees' claims growing out of the merger.

Both parties concede that they have been unable to find any precedent directly in point on this question; and after considering all aspects of the problem in the light of the briefs and arguments of the respective attorneys, the Court has reached the conclusion that the implementing agreements in these cases are binding upon the parties to the same degree and in the same respects as the agreements involved in the Arnold and Cantrell cases.

As the Interstate Commerce Commission did not undertake to determine the rights of the individual employees or groups of employees, the obvious thrust of its order was that the interested parties should execute agreements as to how disputes should be settled. The Commission's order adopted Condition 8 of the Oklahoma case, specifically providing that disputes arising with respect to protective benefits may be referred by either party to an arbitration committee for consideration and determination, and further providing that "the formation of [such] committee, its duties, procedure, expenses, etc., shall be agreed upon by the carriers and the employee, or his duly authorized representatives." Further, Sec. 5(2) (f) of the Interstate Commerce Act, as heretofore pointed out reserves to the railroad and the duly authorized representative or representatives of its employees the right to enter into agreements pertaining to the protection of the interests of the employees.

The discussion of the problem is very ably and forcefully presented by the attorneys for the respective parties in their briefs, but the Court is convinced that the position taken by the railroad is the correct one and fully concurs in and adopts the reasoning of the railroad in its brief filed October 24, 1961, which is in part as follows:

"The Court should enter judgment herein adjudging that the parties must arbitrate the disputes as to entitlement to protective benefits in accordance with the arbitration machinery provided for in the appropriate implementing agreement made between the Railroad Company and the duly authorized representative of its employees, as defined by the Railway Labor Act (45 U.S.C., Sec. 151, et seq.).

"Disputes as to entitlement to protective benefits are to be resolved by arbitration. Arnold v. Louisville and Nashville Railroad Company, 180 F.Supp. 429. The Interstate Commerce Commission ordered that the arbitration of such disputes is to be as provided for by Condition 8 of the Oklahoma Conditions. 295 I.C.C. 457. In that case the Commission stated that said Condition 8 'provides for consideration and determination by an arbitration committee of questions regarding the eligibility for protection of persons or groups elsewhere described in the conditions'.

"Condition 8 of the Oklahoma Conditions provides:

"'In the event that any dispute or controversy arises with respect to the protection afforded by the foregoing conditions Nos. 4, 5, 6, and 7, which cannot be settled by the carriers and the employee, or his authorized representatives, within 30 days after the controversy arises, it may be referred, by either party, to an arbitration committee for consideration and determination,

the formation of which committee, its duties, procedure, expenses, et cetera, shall be agreed upon by the carriers and the employee, or his duly authorized representatives.'

"It is quite obvious that some implementing agreement setting up arbitration machinery must be made in order to comply with the Commission's order. With whom such implementing agreements are to be made is the question to be determined by the Court in this case. We candidly admit that we are unable to find any precedent that is precisely in point. Such precedent is as lacking for defendants as for us. However, we firmly believe our opinion that such implementing agreements must be made between the railroad and the duly authorized representative of its employees, as such duly authorized representative of its employees is defined by the Railway Labor Act, is fully supported as we will hereinafter show.

"The history of labor relations in the railroad industry, at least since the enactment of the Railway Labor Act, supports our position and shows that the railroad is forbidden to make agreements with its individual employees. Rather, it must make all agreements with the duly authorized representative of its employees in all cases where such employees have such duly authorized representatives. That was clearly decided by the United States Supreme Court in 1937 when it held in the case of Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515 [57 S.Ct. 592, 81 L.Ed. 789], that an injunction was proper to enforce the duty of the railroad to treat with the duly authorized representative of its employees. In connection with making agreements, the Court held:

"'It imposes the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no others.'

"It is no answer for defendants to suggest that agreements involving protective benefits for adversely affected employees as a result of mergers or consolidations are outside the ambit of the subjects concerning which the railroad and the duly authorized representatives of its employees may make agreements. The Washington Agreement of May 21, 1936, is the 'Granddaddy' of such protective conditions and that agreement is one made between the railroads and the duly authorized representatives of their employees as defined by the Railway Labor Act.

"Defendants have contended it would be unfair and an impairment of their rights to be required to submit their claims for protective benefits to an arbitration committee concerning which they were denied any right of choice in its formation. The Railway Labor Act furnishes an analogy on this point. In the railway labor field Congress, by that act, has specifically provided for arbitration of an individual employee's claims before an arbitration board selected by the carriers and the duly authorized representatives of their employees.

"The various divisions of the National Railroad Adjustment Board are actually nothing more than arbitration boards whose members are selected by the carriers and the duly authorized representatives of their employees. The Railway Labor Act also provides for the selection of System boards by carriers and the duly authorized representatives of its employees to resolve claims of individual employees. It cannot be doubted that Congress has encouraged and provided for the arbitration of disputes between carriers and their employees concerning the individual employee's claims before boards in which the individual employee does not participate in its selection. The Supreme Court has for many years vigorously protected and upheld the jurisdiction and power of the Adjustment Board. In fact that Court has held the jurisdiction of the National Railroad Adjustment Board to be exclusive. In the case of Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 the Court held:

" 'In this case the dispute concerned interpretation of an existing bargaining agreement * * * in 1934 Congress, with the support of both unions and railroads, passed an amendment which directly created a national Adjustment Board composed of representatives of railroads and unions. 48 Stat. 1189–1193. The Act thus represents a considered effort on the part of Congress to provide effective and desirable administrative remedies for adjustment of railroad-employee disputes growing out of the interpretation of existing agreements. The Adjustment Board is well equipped to exercise its Congressionally imposed functions. * * *

" 'The paramount importance of having these chosen representatives of railroads and unions adjust grievances and disputes was emphasized by our opinion in Order of [Ry.] Conductors v. Pitney, supra [326 U. S. 561, 66 S.Ct. 322, 90 L.Ed. 318]. There we held, in a case remarkably similar to the one before us now, that the Federal District Court in its equitable discretion should have refused "to adjudicate a jurisdictional dispute involving the railroad and two employee accredited bargaining agents * * *." Our ground for this holding was that the court "should not have interpreted the contracts" but should have left this question for determination by the Adjustment Board, a congressionally designated agency peculiarly competent in this field. 326 U.S. at 567–568 [66 S.Ct. at page 325, 90 L.Ed. 318]. This reasoning equally supports a denial of power in any court —state as well as federal—to invade the jurisdiction conferred on the Adjustment Board by the Railway Labor Act.'

" 'We hold that the jurisdiction of the Board to adjust grievances and disputes of the type here involved is exclusive. * * *'

"In a case decided June 29, 1959, styled Pennsylvania R. Co. v. Day, 360 U.S. 548, 79 S.Ct. 1322, 3 L.Ed.2d 1422 the Court said:

" 'The National Railroad Adjustment Board was established as a tribunal to settle disputes arising out of the relationship between carrier and employee. All the considerations which led Congress to entrust an expert administrative board with the interpretation of collective bargaining agreements are equally applicable when, as here, the employee has retired from service after initiating a claim for compensation for work performed while on active duty. * * *' (360 U.S. 551 [79 S.Ct. 1324])

* * * * * *

" 'Thus it is plain both from a reading of the Act in light of its purpose and the needs of its administration and from the settled administrative interpretation that the Board has jurisdiction over respondent's claim for compensation.

" 'Since the Board has jurisdiction, it must have exclusive primary jurisdiction. All the considerations of legislative meaning and policy which have compelled the conclusion that an active employee must submit his claims to the Board, and may not resort to the courts in the first instance, are the same when the employee has retired and seeks compensation for work performed while he remained on active service. * * *' (360 U.S. 552 [79 S.Ct. 1324])

* * * * * *

" 'Our consistent regard for the importance of having disputes between railroad employees and carriers settled by the administrative Board which Congress established for that purpose requires respondent to resort to the NRAB for adjudication of his claim.' (360 U.S. 554 [79 S.Ct. 1325])

"Counsel for defendants has argued that it is inconceivable after Congress

had authorized and required the Commission to provide 'a fair and equitable arrangement' to protect the employees that the Commission could lawfully provide for arbitration before a committee about whose membership the employee had no voice. We submit that the Railway Labor Act is a forceful expression of what Congress regards to be fair and equitable concerning the selection of an arbitration board and the Supreme Court has not only upheld the exclusive jurisdiction of the Board but commented upon the wisdom of Congress in providing for such a Board.

"We make no contention that the defendants' claims for protective benefits are claims to be referred to the National Railroad Adjustment Board. We only wish to show that there is nothing manifestly unfair or inequitable about requiring an employee to submit his individual claim to an arbitration board in which he personally does not participate in the selection of its members. This is the usual and accepted method—it does not present an inconceivable or exceptional procedure. This is the background with which we must approach the problem of determining the intention of Congress in enacting Section 5(2) (f) of the Interstate Commerce Act and of the Interstate Commerce Commission in prescribing conditions thereunder.

"We believe the requirements of the Commission's order and Section 5(2) (f) of the Interstate Commerce Act are complied with in respect to arbitration when a carrier and the duly authorized representative of its employee set up an arbitration committee to resolve disputes concerning entitlement to protective benefits.

"Counsel for defendants has contended to plaintiff's counsel that 'I cannot believe that there is any serious contention that these men were not affected by the merger since their termination was the direct result of a difference in the L&N contract from the NC&StL contract.' While we do not agree that his clients were adversely affected as a result of the merger, we do agree that the construction of collective bargaining agreements will often be material in arbitration proceedings. Oftentimes individual employees within the same craft or class and covered by the same agreement will disagree as to the interpretation of the agreement. Certainly, the duly authorized representatives of the employees of that craft or class is vitally concerned, as is the carrier, in the agreements' proper interpretation. Surely the parties making the agreements are in better position to know what was intended by them. Mr. Harwood's interpretation of Condition 8 of the Oklahoma Conditions would exclude the duly authorized representatives of the employees from having a voice in naming a committee that must interpret an agreement made by them, a situation Congress so carefully avoided in the Railway Labor Act.

"Subsequent to the consummation of the merger on August 30, 1957, the plaintiff has paid and continues to pay substantial amounts to employees who have been adversely affected as a result of the merger. Some employees, however, and there may be others, have presented claims who have been adversely affected by economic conditions, automation and by other reasons not related to the merger. Before such claims subside it may be necessary to arbitrate hundreds of such cases. Surely the Commission did not impose upon the carrier the legal requirement of setting up what could develop to be hundreds of separate arbitration committees by requiring it, if demanded by the employee, to set up a separate arbitration committee with each individual employee who may fancy himself to have been adversely affected as a result of the merger. While in this particular case, counsel for plaintiffs have expressed a willingness to agree that one arbitration committee would serve these plaintiffs as a group, they, nevertheless, are advocating an interpretation, absent such an agreement, that would require the carrier to set up a separate arbitration committee with each individual employee. We need not detail here the

varied and inconsistent applications of the collective bargaining agreements and the protective conditions to specific cases even within the same craft or class of employees under precisely the same factual situation that could be expected to result.

"We submit that there can be no doubt that the carrier and the duly authorized representative of its employees may enter into agreements concerning protective conditions. Such agreements were entered into prior to the enactment of Section 5(2) (f) of the Interstate Commerce Act in 1940.[1] Congress expressly reserved the right of the carriers and the duly authorized representatives to enter into such agreements after the enactment of Section 5(2) (f), notwithstanding any other provision of the Interstate Commerce Act. The duly authorized representatives of the employees make such agreements only on behalf of employees they are authorized to represent pursuant to the provisions of the Railway Labor Act. If the employees are free to disregard such agreements that may be made between a carrier and the duly authorized representatives of the carrier's employees, we submit that such agreements are lacking in mutuality since the carrier is no more obligated to abide by the terms thereof than are the employees on whose sole behalf the duly authorized representatives entered into such agreements with the carrier. If the duly authorized representative under the Railway Labor Act may not bind the class or craft of employees they purport to represent, then serious doubt exists as to whether the duly authorized representatives under the Railway Labor Act can validly enter into agreements with the carrier concerning protective conditions in the first instance.

"The implementing agreements in this case made between the plaintiff and the duly authorized representatives are not inconsistent with the degree of protection afforded the employees by the Inter-

state Commerce Commission. Such agreements deprive the employees of no substantive right afforded by the Commission's order. The implementing agreements were made consistent with the provisions of the Commission's order for the Commission obviously recognized that the arbitration machinery may be set up by an agreement made between the carrier and the duly authorized representative or duly authorized representatives of the employee or employees.

"There are instances, of course, where a craft or class of employees on a railroad carrier today has no duly authorized representative as defined by the Railway Labor Act. For example, on the railroad of this plaintiff, supervisory officials have no duly authorized representative as defined by the Railway Labor Act, although the Railway Supervisors Association is the duly authorized representative of such employees on other railroads. On The Nashville, Chattanooga and St. Louis Railway, neither the police, stationmasters nor supervisory officials had a duly authorized representative as defined by the Railway Labor Act. On some of the smaller railroads, as, for example, the Carrollton Railroad in Kentucky, none of the employees have such duly authorized representatives.

"The very essence of the question for determination involves an interpretation of this part of Condition 8 of the Oklahoma Conditions:

"'* * * it [any dispute] may be referred by either party, to an arbitration committee for consideration and determination, the formation of which committee, its duties, procedure, expenses, et cetera, shall be agreed upon by the carriers and the employee, or his duly authorized representatives.'

"Counsel for defendants contend that the term 'duly authorized representatives' as used by the Interstate Commerce Commission does not necessarily mean the duly authorized representative of an

1. The Agreement of May 21, 1936, Washington, D. C. was entered into between

the carriers and the duly authorized representatives of their employees in 1936.

employee under the provisions of the Railway Labor Act. In the railroad industry the carriers, their employees, the Congress and agencies charged with the responsibility of regulating the carriers, commonly refer to the appropriate railway labor union as 'duly authorized representative' of an employee. A very forceful illustration of this is contained within the provisions of Section 5(2)(f) itself, wherein Congress, in enacting this section of the Interstate Commerce Act, declared:

> " 'Notwithstanding any other provisions of this Act, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and *the duly authorized representative or representatives of its or their employees.*' (Emphasis added).

"In referring to 'the duly authorized representative or representatives of its or their employees' in Section 5(2)(f) of the Interstate Commerce Act, Congress, without doubt, referred to those representatives as provided for by the Railway Labor Act. The Railway Labor Act and the Interstate Commerce Act, including Section 5(2)(f), must be read in harmony, not discord, especially so in view of the fact that the Interstate Commerce Commission is charged with certain responsibilities in the administration of the Railway Labor Act. Please see, e. g., 45 U.S.C., Section 151, Fifth.

"There apparently is no dispute between counsel for the plaintiff and counsel for the defendants as to what Congress meant by the term 'duly authorized representative' in enacting the very statute under which the Commission is empowered to impose a 'fair and equitable arrangement' for the protection of employees adversely affected as the result of a merger. Counsel for defendants in their brief filed in the Archey case acknowledged this by stating (p. 23):

> " 'The last sentence of section 5 (2)(f) was included as to authorize the collective bargaining representatives of the employees to enter into similar agreements "hereafter".' (Emphasis added)

"There can be no reasonable doubt that when the Interstate Commerce Commission referred to 'duly authorized representative' in Condition 8 of the Oklahoma Conditions, that term, as referred to by the Commission, has precisely the same meaning as Congress intended it to have when Congress referred to that term in Section 5(2)(f), the very statute under which the Interstate Commerce Commission imposed the protective conditions. Surely, the Commission did not intend for the words 'duly authorized representative' to be construed to mean an attorney or some other type of representative with whom such agreements must be made when the Supreme Court of the United States had previously held in the Virginian Railway case, supra, that when an employee had a duly authorized representative as provided for by the Railway Labor Act, the carrier had an affirmative duty to make agreements with that duly authorized representative only and was forbidden to enter into agreements with any other representative.

"As we have heretofore shown, there are certain employees on some railroads and all employees on others who are entitled to protective benefits when adversely affected as the result of a merger, but who have no duly authorized representative as provided for by the Railway Labor Act. Unless provision was made for such employees to make agreements providing for arbitration machinery, there would have been a void in Condition 8 of Oklahoma since such an employee would be without a remedy to resolve disputes as to his entitlement to protective benefits. Since the arbitration of disputes is mandatory, not merely permissive, under the Commission's order, John R. Arnold, et al. v. Louisville and Nashville Railroad Company, supra, it was imperative that the Commission make provision for creation of the arbitration machinery with such an employee. The Commission did make such provision by including in its

order a duty upon the carrier to enter into such implementing agreements with an employee who may have no duly authorized representative as defined by the Railway Labor Act. This the Commission did by providing that the formation of an arbitration committee 'shall be agreed upon by the carrier and the employee, or his duly authorized representatives'.

"The question for the Court's decision is an important one in the field of railway labor relations and will have far reaching effects, especially so since, as the Court is probably aware, there are many merger applications pending before the Interstate Commerce Commission and with the prospect of many more being contemplated. The issues presented by this declaratory judgment action have never been adjudicated. Plaintiff has made a determined effort by inquiries as to the actual practice in earlier cases involving the selection of an arbitration committee under the provisions of Condition 8, but has been unable to find any precedent for either position. The lack of precedent should not detract from the importance of the questions presented."

Without discussing in detail the authorities relied upon by the employees, the Court finds that they are clearly distinguishable from these cases and are not in point either directly or by analogy. The question in the present cases is not whether the individual employees shall have a voice in the settlement of their own claims; nor do the cases involve a destruction or impairment of vested or accrued rights. The crucial issue is as to the proper method to be followed in determining claims of individual employees by arbitration; in other words, the setting up of the arbitration machinery itself. As the Court views the matter, it was the intention of the Interstate Commerce Commission and the intention of Congress, as expressed in the Interstate Commerce Act, that such arbitration machinery should be provided for by the carrier and by the unions certified to represent employees under the Railway Labor Act, or by the carrier and the individual employee himself, where such employee was not represented by such a collective bargaining agent.

In conformity with the views herein stated, a form of judgment will be submitted to the Court in the respective cases as follows: (1) in the Cantrell case, Civil Action 2867, declaring and adjudging that the arbitration machinery provided for by the implementing agreement is binding upon both parties and must be pursued; that the Court is without jurisdiction of the claims of the employees; sustaining the plaintiff's motion to dismiss the defendants' counter claim and the plaintiff's motion for summary judgment; and denying the defendants' motion for summary judgment; (2) in the Archey case, Civil Action 2891, sustaining the defendant's motion to dismiss the action; (3) in the Henry case, Civil Action 2931, declaring and adjudging that the arbitration machinery provided for by the appropriate implementing agreement is binding upon the parties and must be pursued; sustaining the plaintiff's motion for summary judgment; and denying the defendants' motion for summary judgment.