Ira CLEMENS (Individually and on behalf of others adversely affected)

v.

**CENTRAL RAILROAD COMPANY OF NEW JERSEY**

and

**Lehigh & New England Railroad Company.**

No. 37346.

United States District Court
E. D. Pennsylvania.

Feb. 13, 1967.

Lawrence J. Richette, Philadelphia, Pa., for plaintiffs.

Miles W. Kirkpatrick, Philadelphia, Pa., for defendants.

HIGGINBOTHAM, District Judge.

## OPINION

The above action was brought by Ira Clemens on his behalf, and for others similarly situated, against the defendant railroads. The plaintiffs seek an order from this Court to compel the defendants to submit their dispute to arbitration. The defendants have filed motions to dismiss or in the alternative for summary judgment.

The plaintiffs contend that this dispute must be arbitrated in accordance with the Washington Job Protection Agreement of May, 1936, and its modifications as found in the New Orleans Union Passenger Terminal Case, 282 I.C.C. 271 (January 16, 1952). Defendants argue that the complaint should be dismissed on the ground that it fails to state a claim for which relief can be granted. Specifically, the defendants argue (1) this action is barred by the doctrine of res judicata; (2) this Court lacks jurisdiction over the subject matter of the litigation; (3) the plaintiffs have failed to plead a proper class action; (4) this action should be stayed until the costs in a previous action are

paid; and (5) the plaintiffs have waived any right of arbitration which they might have had by bringing this suit. *It is my conclusion that the parties must be required to submit this dispute to arbitration.*

## STATEMENT OF FACTS

In April of 1960, the defendant Lehigh and New England Railway acquired control of the Lehigh and New England Railroad. The Railway obtained the approval of the Interstate Commerce Commission for the abandonment of approximately 77% of the trackage of its acquisition. Approval of this request was granted by the Commission in 1961. Interstate Commerce Commission Finance Docket No. 21155. The Commission imposed, and the defendants accepted certain conditions for the protection of employees of the Railroad as part of its order authorizing the acquisition and abandonment. Essentially, the conditions imposed for the protection of adversely affected workers were derived from the Washington Job Protection Agreement of May, 1936. Briefly, that agreement called for the payment of compensation to railroad workers who have been displaced because of carrier mergers or consolidations.

In seeking permission the Railway informed the Commission that such abandonment would entail severing the employment of approximately one hundred and ten men. Railway, in early 1960, approached the three local lodges [1] with the proposal of revising their collective bargaining agreement so that when an employee reached age sixty-five he would be required to retire without severance pay. This proposal was rejected. Thereafter, in November of 1961, the Railway severed the employment relationship of thirty men who were at that time over sixty-six years of age and paid them severance pay in accordance with the Washington Job Protection Agreement.

In January of 1962, each of the three unions, after approval of their membership, entered into an agreement with Railway which provided for compulsory retirement of all workers when they reached the age of sixty-five. These agreements were ratified by the majority of the members of each of the unions involved. As a consequence of this agreement the plaintiff Clemens, and others, who had been employees of the Railway, were retired at the age of sixty-five *without severance pay.* Some of these adversely affected workers then brought suit against the Railway Company and the unions. See Roberts v. Lehigh and New England Railway Company, 211 F. Supp. 379 (E.D.Pa.1962), affirmed 323 F.2d 219 (3 Cir. 1963).

In *Roberts,* the plaintiffs' complaint was dismissed by Chief Judge Clary, and this dismissal was affirmed by the Court of Appeals. The complaint was dismissed on the ground that the dispute was one over which the National Railroad Adjustment Board had primary jurisdiction, and that the Courts were without jurisdiction to decide the matter. In Chief Judge Clary's judgment the subject of the dispute revolved around the interpretation of the various agreements and not their validity. The Court of Appeals affirmed.

Subsequent to the dismissal of the complaint in *Roberts,* two new complaints were filed, and it is the second of these complaints that the defendants now seek to have dismissed. The unions who were joined as defendants in *Roberts* are not now before this Court. In addition Lehigh and New England Railway Company and its parent, the Central Railroad Company of New Jersey, who were not joined in *Roberts* have now been joined as defendants.

### I.

The defendants argue that the plaintiffs are barred from prosecuting this complaint by reason of the doctrine of

---

[1]. The three unions involved were Lodge 713, Brotherhood of Locomotive Firemen & Enginemen; Lodge 734, Brotherhood of Railroad Trainmen; Lodge 619, Order of Railway Conductors & Brakemen.

res judicata. Specifically, they contend that the decision in *Roberts,* supra, resolved, as against the plaintiffs, all the issues presented by the complaint in the instant case. The essential distinction between this case and *Roberts* is that here the plaintiffs seek to have this Court order the defendants to arbitrate the dispute in accordance with an order of the Interstate Commerce Commission.

At the threshold, we are faced with the question of whether this Court can order arbitration in view of the *Roberts* case. If we are to determine the validity of the defendants' contentions it must first be made clear what was actually decided in that case. When the *Roberts* case was decided in this Court by Chief Judge Clary, the decision turned on the assumption that the only statute applicable to the cause was the Railway Labor Act, 45 U.S.C. § 151 et seq. See 211 F. Supp. 379, 381–382. Chief Judge Clary held that the contentions raised by the plaintiffs constituted a "dispute between employees and carriers as to the interpretation of [a] collective bargaining agreements" within the Railway Labor Act. 211 F.Supp. 379, at p. 381. The resolution of this dispute, Chief Judge Clary held, was within the exclusive primary jurisdiction of the National Railroad Adjustment Board. The Court of Appeals upheld Chief Judge Clary's decision dismissing the plaintiffs' complaint for failure to state a claim for which relief can be granted. Thus it would appear that no decision on the merits was rendered. The defendants, however, point to certain language of the Court of Appeals' opinion which they claim precludes this action.

■ In the earlier suit the plaintiffs had attacked the retirement agreements because they discriminated against the older workers in favor of the younger ones. In response to this argument the Court made the following observations:

> However, the allegations in the complaint do not set forth any facts from which hostile discrimination on the part of defendants would be a permissible inference. There is no assertion that the provision was agreed upon by the Railway for the purpose of weakening one lodge in preference to another, or that it was accepted by the three lodges by reason of fraud or coercion or in 'bad faith and ill will'. Each lodge consented to the inclusion of the provision in the agreement only after a majority of its members voted in favor of it. The fact that the provision may favor younger workers who outnumber older ones with greater seniority rights is not a basis for a claim of hostile discrimination. See Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953) and Steele v. Louisville & N.R. Co., 323 U.S. 192, 203, 65 S.Ct. 226, 89 L.Ed. 173 (1944). (323 F.2d 219 (1963) at p. 223.)

In addition, *Roberts* correctly pointed out that a bargaining representative, within the limits of its constitution, may agree to a change in the terms of a collective bargaining agreement provided such change does not violate the Railway Labor Act. It appears to me that the arguments and opinions in *Roberts* proceeded on the assumption that the terms of the Washington Job Protection Agreement were merely terms privately agreed upon by the unions and railroads. A careful study of the complaint, answers, and the briefs filed in *Roberts* reveals that at no time did the plaintiffs assert that the provisions of the Washington Job Protection Agreement represented not merely a private collective bargaining agreement between the parties, but conditions imposed by the Interstate Commerce Commission for the protection of workers affected by a consolidation—as it is empowered to do by 49 U.S.C. § 5(2) (f).

Thus, considering the facts which were then before it, the following language of the Court of Appeals is perfectly understandable:

> The second reason given by plaintiffs is that the memorandum agreements circumvented certain provisions of the Washington Job Protection Agreement. This claimed reason is, of course, based on plaintiffs' interpre-

tation of the agreements in question. *Even if we assume that they are right in their interpretation, the Act does not make the memorandum agreements invalid for that reason. The bargaining representative, within the limits of its constitution and by-laws, may agree to a change in the terms of a collective bargaining agreement provided such change does not violate the Act.* McMullans v. Kansas, Oklahoma and Gulf Ry., supra, 229 F.2d at p. 56. (at p. 223, emphasis added.)

It is clear, therefore, that the *Roberts* case proceeded on two assumptions: (1) That the agreements involved were all private agreements—which was not the case; and (2) that the applicable statute was the Railway Labor Act—which also was not entirely the case. Assuming, as did the plaintiffs in *Roberts,* that the Railway Labor Act was applicable, the Court of Appeals appropriately found that the agreements did not violate that act.

The plaintiffs now argue that the applicable statute is section five of the Interstate Commerce Act—and I agree. The question now becomes whether they are estopped from raising this issue by the doctrine of res judicata.

The defendants rely on two cases which in their judgment preclude the plaintiffs from seeking arbitration. They are Bruszewski v. United States, 181 F.2d 419 (3 Cir. 1950) and Williamson v. Columbia Gas and Electric Corp., 186 F.2d 464 (3 Cir. 1950). The plaintiffs argue that in this suit, unlike *Roberts,* the unions are not parties, and that the parent railroad and one of its subsidiaries have been joined as parties, therefore any res judicata problems have been obviated. I agree with the plaintiffs that this action is not barred, but not because some of the defendants were not joined in the first action.

■ *Bruszewski* establishes the doctrine that where a binding final judgment has been entered against a party he cannot relitigate the matter by bringing the same action against another defendant where the claim depends on the same acts or omissions. In the instant case not only are the alleged acts or omissions identical but the joined parties are clearly in privity with the defendants in *Roberts* and would be able to have the benefit of the judgment in that case. Therefore, if the judgment in *Roberts* is not binding here, it is not because the parties are different, but for the reason that the issues are different and, in the absence of a previous judgment on the merits, they can be raised here.

The defendants, however, argue that Williamson v. Columbia Gas & Electric Corp., supra, is binding here. In that case, the plaintiff brought two actions for damages alleging violations of the anti-trust statutes. In one suit he alleged that certain acts of the defendant violated the provisions of the Sherman Act. In the second suit he alleged that the same acts violated provisions of the Clayton Act. The complaint based on the Clayton Act was dismissed with prejudice because the action was barred by the statute of limitations. The defendant claimed that the judgment of dismissal in that case had res judicata effect on the Sherman Act complaint. The plaintiff asserted that res judicata did not apply because the two suits were different "causes of action." The Court upheld the defendants' contention that res judicata applied:

> Another difference claimed by the plaintiff in the two actions is that one suit is said to rest on the Sherman Act and the other on the Clayton Act. This argument carries no weight. While the rule may not have been clear at one time, we think it is now clear that the fact that different statutes are relied on does not render the claims different 'causes of action' for purposes of res judicata. (at p. 468.)

The defendants argue that the instant case presents a situation very similar to the one in *Williamson,* supra, and thus the same result should follow.

*Williamson* must be understood in light of its facts. As noted earlier the plaintiff in that case brought two actions, one

under the Sherman Act, and the second under the Clayton Act. For reasons which are unclear, the Clayton Act complaint, in point of time, was decided first. In the suit under the Clayton Act, the defendant moved to dismiss the complaint on the ground the plaintiff had failed to state a claim for which relief could be granted. Both parties stipulated that any right of action possessed by the plaintiff accrued not later than January 1, 1931. The motion to dismiss was granted by the trial court. See 27 F.Supp. 198 (D.Delaware, 1939). The Court of Appeals affirmed. Williamson v. Columbia Gas and Electric Corporation, 110 F.2d 15 (3 Cir. 1939).

The defendant contended that the action was barred by the statute of limitations because the suit was brought beyond three years of the accrual of the cause of action. The plaintiff, on the other hand, argued that an anti-trust action was analogous to the common-law action of "debt on a specialty", and that the applicable limitations period was twenty years. The action, therefore, would not be barred until January 1, 1951.

Highly relevant to an understanding of the case, is the fact of the absence of a limitation period in both the Clayton and Sherman Acts at that time. The district court rightly held that since the anti-trust statutes did not contain their own limitation period Delaware's statute of limitations was applicable. The Court was then faced with the problem of determining which time period was the correct one:

> In order to apply a statute of limitations, such as that of Delaware, which reads in terms of common law actions, to a civil action brought in a district court, it is necessary for the court through a consideration of the nature of the cause of action disclosed in the complaint to determine the form of action which would have been brought upon it at common law. *It is evident that the complaint in the case before us discloses a cause of action which, under the common law of Delaware,*

> *would be enforceable in an action on the case and not in an action of debt on a specialty. The district court, therefore, properly held that the action was barred by the Delaware statute of limitations.* (110 F.2d 15, at p. 20; emphasis added.)

Having found that an anti-trust action sounded in tort under the relevant laws of Delaware it follows that when confronted with another complaint containing essentially the same allegations and demanding the same type of relief, the Court would apply the doctrine of res judicata. The correctness of this interpretation can be established by reference to the last *Williamson* opinion where the Court of Appeals observed that:

> The best way to find out what is involved in the two actions is to look at the claims made by the plaintiff. Neither case went to trial on the facts so all we have is what the plaintiff charges, plus the supplementary affidavits, motions, and the like, which led up to the action of the Trial Judge dismissing plaintiff's action No. 1. *The plaintiff alleges its organization and entry into the gas business. It says that the defendant, seeking to crush out a competitor, acquired the controlling shareholder interest in the plaintiff company and proceeded to manipulate its affairs to the disadvantage of the plaintiff and the advantage of the defendant. It says that after the plaintiff went into receivership the defendant named and controlled the receiver and the final result was that the plaintiff was forced into bankruptcy.* This is a general statement; no attempt has been made to particularize individual charges. (186 F.2d 464, at p. 467; emphasis added.)

It must be recognized that the Clayton Act forbids acquisitions which tend to "lessen competition" or "tend to create a monopoly" whereas the Sherman Act proscribes existing monopolies. It should also be recognized that the dismissal of an action by reason of its being barred by the statute of limitations is an adjudication upon the merits. See Angel v. Bul-

lington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947). Therefore, having found that the Clayton Act action was barred—thus ruling that the defendant's actions did not "tend to lessen competition"—the Sherman Act complaint charging actual monopolization was necessarily barred. *Williamson,* therefore, turned on a peculiar synthesis of the Delaware statute of limitations, common law forms of pleading, and a certain substantive overlapping of the federal anti-trust statutes.[2]

A review of *Williamson* establishes the following. *First, and foremost, the dismissal of the action was one on the merits. Second, the right violated and the legal wrong, in each case, were the same.* The right could be described as the plaintiff's privilege to conduct its business free from illegal economic restraints. The wrong was the invasion of that right by acts which unlawfully restrained that right. Every action of the defendant alleged in the Sherman Act suit had its origin in the alleged unlawful acquisition of stock which was raised in the Clayton Act proceedings.

In the instant case the statutes involved do not overlap, nor, in fact, are they similar. In addition, they do not proscribe the same actions. The *Roberts* case correctly held that an involuntary retirement agreement does not violate the Railway Labor Act. *However, the question of whether an otherwise valid retirement agreement could be applied to a group of employees entitled to protection under a provision of the Interstate Commerce Act could not be determined by an interpretation of the Railway Labor Act.*

It might very well be the case that given the doctrine of the *Williamson* case, if the Court in *Roberts* had decided that the plaintiffs had no right to severance pay, under any circumstances, they (plaintiffs) would have been precluded from further action. That is to say, if the Court in *Roberts* had decided the case on the merits, res judicata would apply even if the wrong statute had been construed. The defendants could then have argued that the plaintiffs having had the opportunity to raise the Interstate Commerce Act point and having failed to do so, were barred from challenging the *Roberts* decision. Fortunately, for the plaintiffs the Court of Appeals left the matter open.

The Court of Appeals decided, *on the basis of the facts before it,* that the interpretation of the agreements lay in the exclusive jurisdiction of the Railroad Adjustment Board. Even more crucial was the Court's statement that if the plaintiffs abandoned their desire for reinstatement and accepted their discharge as final, they could bring a civil action for damages. See Moore v. Illinois Central Railroad Co., 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089 (1941).

\* \* \* *They [the plaintiffs] do not concede that the Railway had the right to retire them even though it paid them the proper amount of severance compensation.* They argue that other employees with less seniority than they should have been furloughed instead. They do not ask for severance pay as such but are attempting to recover by way of punitive damages an amount equal to the total of the sums which would be paid them if they were considered as being deprived of their employment under the Washington Job Protection Agreement. (323 F.2d at p. 224; emphasis added.)

We must bear in mind the fact that in *Roberts* the plaintiffs sought reinstatement, whereas in the present action they do not. At the very least the *Roberts* opinion suggests that they were not en-

---

**2.** It should also be noted that the Sherman Act complaint charged a continuing conspiracy, which might ordinarily have alleviated the limitations problem, as to acts alleged to have occurred after January 1, 1931; however, since the gravamen of the plaintiff's complaint was dismissed on the merits, the plaintiff could not then avail itself of the "continuing conspiracy" theory. In short, a decision on the merits was an adjudication that these acts failed to establish a violation of the anti-trust laws.

titled to that mode of relief. *It did not, however, close the door to the plaintiff's prayer for some kind of relief.* The plaintiffs were given the option of accepting their discharge as final and then seeking severance pay—which is precisely the relief now sought by them. Therefore, plaintiffs should not be precluded from bringing this action by the doctrine of res judicata.[3]

■ The decision in *Roberts* was based on the Court's lack of jurisdiction under the Railway Labor Act, and its finding—most proper under the circumstances—that primary jurisdiction lay elsewhere. That decision was not on the merits. Therefore, this Court is not precluded from finding that a different statutory scheme—one calling for arbitration—is applicable. Accordingly, the plaintiffs are correct in advancing this alternative avenue of relief. The doctrine of res judicata should not apply, where, as here, the litigation has not yet reached a state of repose.

## II.

■ Alternatively, the defendants argue that the complaint must be dismissed because the statutes on which the plaintiffs rely do not confer upon this Court jurisdiction over the subject matter. Insofar as the plaintiffs rely on 49 U.S.C. § 5(8) the defendants are correct. That section states that the "district courts of the United States shall have jurisdiction *upon complaint of the Commission,* alleging a violation of any * * * order issued by the Commission thereunder. * * *" It appears that it was contemplated that only actions brought by the Commission itself would be entertained under this section. Therefore, to the extent that the plaintiffs rely on this section this Court has no jurisdiction to grant them relief.

■ The plaintiffs rely also on 28 U.S.C. § 1336 which they contend provides an alternate ground of jurisdiction. This section provides that the district courts "shall have jurisdiction of any civil action to enforce, enjoin, set aside, annul or suspend, in whole or in part, any order of the Interstate Commerce Commission." The defendants argue that Arnold v. Louisville & Nashville

3. The defendants have brought to the attention of the Court, that in Republic Steel Corporation v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), the Supreme Court appeared to invite the overruling of the rule of Moore v. Illinois Central R. Co., supra. They point out also that in Walker v. Southern Railway Co., 354 F.2d 950 (4 Cir. 1965), the Court of Appeals for the Fourth Circuit, relying on Maddox, ruled that even where a worker accepts his discharge as final and seeks damages he must first exhaust his administrative remedies.

Subsequent to the filing of briefs in the instant action, the Supreme Court heard, and decided, the Walker case. See Walker v. Southern Railway Co., 385 U.S. 196, 87 S.Ct. 365, 17 L.Ed.2d 294 (December 5, 1966). The Court declined to overrule Moore—at least in that case. It pointed to the difficulties experienced by workers in securing relief under the Railway Labor Act, and took note of Public Law 89–456, 80 Stat. 208–210 which drastically revised the grievance procedures under the Railway Labor Act.

It observed that since Walker's case had arisen before the passage of PL 89–456, the new procedures were not available to him. Finally, it noted the contrast between the administrative remedy available in Maddox, supra, and that in Walker.

The Walker opinion gives some indication that in a proper case the rule of Moore might well be overruled. In any case, the trend towards requiring exhaustion of administrative remedies as exemplified in Maddox, and scarcely restrained by the Walker case, would hardly be reversed by the result here. This Court does not undertake to decide the ultimate question of plaintiffs' right to severance pay, but only that the dispute is arbitrable. *It is true that the plaintiffs have brought suit, however, they seek merely an order to compel recourse to an administrative forum. Therefore, the decision to order arbitration here is perfectly in keeping with a policy favoring the utilization of administrative procedures—at least in the first instance.*

R. R., 180 F.Supp. 429 (M.D.Tenn.1960), aff'd. *sub nom.* Batts v. Louisville & Nashville R. Co., 316 F.2d 22 (5 Cir. 1963) supports their contention that this section also does not confer jurisdiction. This argument must be rejected.

In *Arnold,* the plaintiffs, formerly employees of a merged railroad, brought suit to recover compensation under the provisions of the Washington Job Protection Agreement as imposed by the Interstate Commerce Commission. The Court held that the action could not be sustained under 28 U.S.C. § 1336. Specifically, the Court held that the plaintiffs' rights were founded not upon the I.C.C. order but upon a subsequent agreement entered into by the unions and carrier *supplementing* that order. The agreement in *Arnold* was significantly different from that in the instant action, because it did not undertake to abrogate any benefits imposed by the Commission for the protection of adversely affected employees, but, on the contrary, sought to supplement them.[4] As was noted in Arnold:

> Thus, while the statute requires the Commission to make provisions for the protection of employees adversely affected, it specifically reserves to the railroad employees the right, through their duly authorized representatives, to enter into an agreement with the railroad as to terms, conditions and arrangements for their own protection. Under this provision of the statute, as the Court construes its meaning and effect, the employees may, through a collective bargaining agreement with the railroad, make *provisions for their own protection by adopting, supplementing or implementing the provisions made by the Commission for their protection.* It would appear logically to follow that such an agreement takes the place of the order of the Commission *insofar as the agreement and the order relate to the same subject matter.* (180 F.Supp. at pp. 433–434; emphasis added.)

The agreement in the instant action cannot be said to be one designed to adopt, implement or supplement the protective order imposed by the I.C.C. This is so because the agreement here abrogates the benefits imposed by the Interstate Commerce Commission. Thus, if the plaintiffs are entitled to any benefits they must rely on the order of the Commission itself. The agreement in *Arnold* merely elaborated the mode of protection imposed by the Commission; the agreement here would obliterate that protection.

The language of 28 U.S.C. § 1336 explicitly gives the district courts jurisdiction to enforce orders of the Interstate Commerce Commission. See Railway Labor Executives' Ass'n. v. United States et al., 339 U.S. 142, 70 S.Ct. 530, 94 L.Ed. 721 (1950). Where, as here, the rights of the plaintiffs, if any, are founded on such an order, this Court has jurisdiction to entertain the action. It should also be noted that the Court in *Arnold* ruled as it did particularly because it felt that the plaintiffs should arbitrate the dispute as provided in the Commission's order. *Here, the plaintiffs also seek to have arbitration of their dispute with the defendants. Arnold* must be read in the context of its particular facts, and, when so read, does not bind us here.

### III.

The defendants urge the Court to dismiss this action insofar as it is represented to be a class action. They argue that (a) the plaintiffs have not demonstrated that they can represent the class adequately, (b) the nature of the class is not clearly defined, and (c) there is no indication of the size of the class.

In support of these contentions they rely primarily on D & A Motors v. General Motors, 19 F.R.D. 365 (S.C.N.Y. 1956). The defendants contend that the allegations stated in plaintiff's complaint are similar to those made in the above case in which a class action was dis-

---

4. As we shall see the term "supplement" will have crucial significance in section five when we deal with this Court's power to order arbitration in this case.

missed becaue it did not conform to the requirements of Rule 23 of the Federal Rules of Civil Procedure.

 The *D & A Motors* case was a class action brought by some automobile dealers seeking treble damages, under the anti-trust laws, against the defendants. The Court dismissed the class action because the claims of the alleged class members were so numerous and varied as to make it impractical to try them together. The Court held also that it was unclear whether:

> the class referred to is confined to former dealers driven out of business, is comprised of all would-be dealers allegedly denied access to the industry, or also includes independent dealers still doing business in the face of the monopolistic practices alleged. (at p. 366.)

In the instant case it appears to be quite clear what group of persons are represented. They are men discharged by the defendants who have either reached the age of sixty-five, and have been retired, and those shortly to reach that age. Indeed the class is further limited in that it includes only those men who worked for the railroad before the I.C.C. order was entered. Nor does it seem to this Court that the claims of the members of the purported class are so "numerous and varied" that they would make the class-suit device impractical. The claims of the members stem from the same factual situation and raise a common legal question. Assuming arguendo, that the plaintiffs have met the pleading requirements, then the legal question raised is common to all of them on the merits. Although the monetary sums to which the class members would be entitled might vary, because of different lengths of service, all recoveries would depend on whether the dispute was held to be arbitrable.

 Although the plaintiff has not been exact in his allegations concerning the number of class members, he has been reasonably specific. The defendants have been put on notice that the class will not exceed the figure two hundred.

In any event, the defendants are obviously aware of the number of men who have been involuntarily retired. The Federal Rules of Civil Procedure do not require the specificity in pleading that once was required. Admittedly, even under these liberal rules of pleading the defendants must understand the nature of the plaintiffs' claim; however, in my judgment this requirement has been met here.

IV.

The defendants contend that should the plaintiffs' complaint be upheld, this action should be stayed because the plaintiffs in *Roberts,* supra, of which group Ira Clemens was one, have not yet paid the costs assessed against them. To support this argument they cite Gainey v. Brotherhood of Railway & S. S. Clerks, etc., 34 F.R.D. 8 (E.D.Pa.1963).

*Gainey* was a class action in which the plaintiffs sought to recover back wages from the defendant railroad and damages from a bargaining agent. The plaintiffs' complaint was dismissed and they filed a second complaint alleging essentially the same facts. The defendants moved to stay the second action until the costs assessed against the plaintiffs were paid. That motion was granted by the Court.

 That decision was based on an interpretation of Rule 41(d) of the Federal Rules of Civil Procedure with which I do not differ. However, a careful reading of Judge Freedman's opinion indicates that there is no absolute rule which requires a stay of one action because costs assessed in a related action have not been paid. Judge Freedman noted that:

> When all is said and done, each case must be decided on its individual circumstances. These include the relative situation of the parties, the history and content of the prior litigation in which the costs were incurred, and the current litigation before the court. *It is a situation which peculiarly calls for the exercise of judicial discretion.* (at p. 11, emphasis added.)

Clearly, the decision as to whether this action should be stayed rests within the sound discretion of this Court. Rule 41(d) is permissive in nature and does not require an automatic stay. Therefore, we must determine whether the decision in *Gainey* can be distinguished from the instant case. It is the judgment of this Court that it can.

*Gainey* appears to rest on three grounds, (a) that the parties to both actions were the same, (b) that no showing of the inability of the plaintiffs to pay was made, and (c) that the likelihood of the plaintiffs' success in the second suit was small. It is undoubtedly true that the plaintiffs are the same as in *Roberts*. It is also true that the plaintiffs are seeking compensation, whether it is sought in damages as in *Roberts,* or compulsory arbitration as is now sought. Essentially, the plaintiffs feel that they have a right to remuneration whatever form the proceedings take. Nor can it be denied that, even if it is true that Clemens is the only plaintiff who is of record in both proceedings, the relief which is sought will benefit all of the workers. Thus, if the identity of the plaintiffs in both suits was the only factor, the defendants' request for a stay should be granted. However, there are other factors which must be considered.

In *Gainey,* the Court was not impressed with the plaintiffs' contention of inability to pay court costs. I must decide whether the same contention advanced here has any merit. It should be noted that the class in *Gainey* was at least three times as large as that here, and that its members were, at the time of the action, gainfully employed. The class in *Gainey* numbered 600 and the assessed costs were $1,501.85. This sum amounted to approximately $2.50 per plaintiff. Although the sum assessed in *Roberts* is not great we must take into consideration the fact that the plaintiffs in this litigation have been retired and are living on pensions which total at most $135.00 a month. It can safely be said that they are in far less comfortable circumstances than the plaintiffs in *Gainey.* The staying of this action till costs are paid may effectively reduce their chances of receiving compensation —if they are entitled to it.

This Court is not prepared to say that the dismissal of the *Roberts'* complaint indicates that there is no chance of the plaintiffs' success in this action. The plaintiffs have raised interesting questions which are worthy of a full hearing.

Finally, the defendants seek to convince the Court that the plaintiffs have been initiating "oppressive and vexatious litigation"—a tactic which Rule 41 is designed to prevent. I am by no means convinced that this is the motive of the plaintiffs. Rather, it appears that the plaintiffs believe that they have a justified grievance and are seeking to plead a complaint which will be legally sufficient. The discretion granted to the Courts under Rule 41(d) to stay this action will not be exercised in this case.

## V.

The defendants argue that this Court cannot order this dispute arbitrated. Alternatively, they contend that even if the dispute is arbitrable the plaintiffs waived their right to arbitration by electing to bring suit. For purposes of clarity, I will deal first with defendants' alternative argument.

The defendants rely on a series of cases to establish the proposition that by bringing suit the plaintiffs have waived their right to have the dispute arbitrated. See Galion Iron Works & Mfg. Co. v. J. D. Adams Mfg. Co., 128 F.2d 411 (7 Cir. 1942); Cavac Compania v. Board for Val. of German Bonds, 189 F.Supp. 205 (S.D.N.Y.1960); American Locomotive Co. v. Gyro Process Co., 185 F.2d 316 (6 Cir. 1950); The Belize, 25 F.Supp. 663 (S.D.N.Y.1938). Each of these cases were brought under the Federal Arbitration Act, 9 U.S.C. § 4 and do not support the principle contended for by the defendants. It is true that the cases above do state the principle that a right to arbitration can be waived by the institution of suit; however, in

those cases the courts made it clear that the plaintiffs had to elect between their remedies. In short, either they sought arbitration or by filing suit have the dispute resolved by the courts. In none of these cases was the plaintiff placed in the position in which the plaintiffs here would find themselves if the defendants' arguments were adopted. In the line of cases relied on by the defendants, the plaintiffs were able to have their complaints resolved by the courts even if they could no longer have them arbitrated. Here the plaintiffs would be unable to go to arbitration and this Court would be unable to resolve the dispute. This is so because by bringing this action the plaintiffs do not seek to have an adjudication of their underlying claim, but only an order compelling arbitration. Therefore, the cases relied on by the defendants are inapposite.

The second issue—this Court's power to compel arbitration—is more difficult to resolve. Both the defendants and the Interstate Commerce Commission argue that this Court is without power to order arbitration. Specifically, they argue (1) that the retirement agreements are valid, (2) that they were authorized by 49 U.S.C. § 5(2) (f), (3) that the issue sought to be arbitrated is beyond the scope of the arbitration provisions of the Washington Job Protection Agreement, and (4) that the Washington Job Protection Agreement provides that where one is deprived of employment because of age its provisions are inoperative.

The defendants first argue that the retirement agreements were held to be valid by the Court of Appeals in *Roberts* and also that their validity is confirmed by the rationale of Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). I agree that these cases confirm the validity of those agreements under the Railway Labor Act. The issue, however, is not their validity, but whether they can be applied to the plaintiffs. That is to say, whether an otherwise valid provision can be applied to workers who were "affected" as a result of a coordination of facilities, if the provision post-dated the I.C.C. protective conditions. It is the judgment of this Court that under those circumstances such a provision could not be so applied.

The conditions imposed by the Interstate Commerce Commission were based on a provision of the Interstate Commerce Act which empowers the Commission to provide protection for employees adversely affected by mergers and consolidations.[5]

I requested the Interstate Commerce Commission to file an amicus curiae brief and participate in oral argument. At the argument the Interstate Commerce Commission took the position that the memorandum retirement agreements fall within the ambit of the "notwithstanding" clause of § 5(2) (f) under which the authorized representatives of the employees may enter into an agreement with the carrier providing for the protection of affected employees. The plaintiffs,

---

5. 49 U.S.C. § 5(2) (f) provides:

As a condition of its approval, under this paragraph of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employ-

ment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees.

on the other hand, vigorously deny that the retirement agreements constitute "protection of their interests." Thus, we must determine the meaning of the "notwithstanding" proviso.

The proper meaning of this clause, we believe, was provided in Arnold v. Louisville & Nashville R. R., supra. There the Court decided that any supplementary agreement between the authorized representative and the carriers must be *adoptive, supplementive or implementive,* and that any agreement must deal with the same subject matter as the I.C.C. order. The plain meaning of those words would suggest that an agreement which denied all benefits to the employees was neither adoptive, supplementive or implementive.[6] In *Arnold,* the Court approved, at least by implication, an agreement, negotiated under the "notwithstanding" proviso, which provided for a lump sum payment instead of protection ordered by the Interstate Commerce Commission. A lump sum payment instead of benefits extending over a four year period can be justified as "adoptive" of the I.C.C. order because it provides the employee with a sum which may reflect the present value of payments extended over a four year period of time. It may enable the employee to take action with regard to his financial future which he might not be otherwise able to take. Clearly, the instant case does not meet the test of *Arnold* unless, of course, the phrase "protection" has some other meaning.

The defendants make the further argument that when § 5(2) (f) speaks of protecting the interests of "employees affected" it refers to the whole class of employees and not merely to those whose jobs are lost and/or whose relationship with the carrier is severed. Implicitly, it argues that all employees were affected by the consolidation in the sense that any of them could have been displaced. Thus, the crucial stage would be the potentiality of displacement and not actual displacement. Viewed in this light the retirement agreements would reflect a policy judgment concerning the best interests of the entire group, favoring the younger workers over the older ones. This is a plausible view of the provision's meaning, however, the legislative history of § 5(2) (f) leads me to the conclusion that this interpretation does not conform to the intention of Congress or the practice of the Interstate Commerce Commission.

Prior to the Transportation Act of 1940, there was no statutory provision specifically requiring the protection of employees affected by consolidations of railroad facilities. In 1933, Congress passed the Emergency Railroad Transportation Act. One of the provisions of that Act authorized the Interstate Commerce Commission to give its approval to consolidations "upon terms and conditions * * * found to be just and reasonable." 48 Stat. 217. The Act expired in 1936. By this time, it had become widely apparent to much of the industry that the economies to be gained from consolidations or abandonments would be realized mainly at the expense of displaced labor. In 1936, the Washington Job Protection Agreement was signed in response to this problem.[7] This was a collective bargaining contract approved

6. In an affidavit sworn to by J. A. Cradock, Vice President of the defendant, Central Railroad of New Jersey, the following facts were admitted: Employees retiring at or after age 65 immediately prior to the effective date of the memorandum agreements, i. e., July 1, 1962, received retirement benefits under the Railway Retirement Act of 1937, as amended, 45 U.S.C.A. Sections 228a to 228y, inclusive. Employees retiring on or after July 1, 1962, received no benefits over and above those received by employees retiring

theretofore by reason of the memorandum agreements and no separate understandings or agreements providing for supplemental financial benefits or other specific benefits to persons who had attained the age of 65 and who would attain the age of 65 before July 1, 1962, were made.

7. This agreement is published in the Hearings held by the House Committee on Interstate and Foreign Commerce on H.R. 2531, 76th Cong., 1st Sess. 231–241 (1939).

by approximately eighty-five percent of the railroad carriers and twenty of the twenty-one railroad brotherhoods. It contained a schedule of benefits recommended for employees adversely affected by consolidations or coordinations.

In 1938, President Roosevelt appointed a "Committee of Six" to consider the question of transportation, including railroad consolidations, and to recommend legislation.[8] This committee was composed equally of representatives of railroad management and labor. They endorsed the Washington Job Protection Agreement and recommended amending § 5 of the Interstate Commerce Act to include the following language:

> After the details of any proposed consolidation have been determined by the interests involved, they should be embodied in an application for approval, addressed to the Transportation Board. In passing upon such an application, the Board should be governed by the following considerations: * * *
>
> * * * (d) The interests of the employees affected. The Board shall examine into the probable results of the proposed consolidation and require, as a prerequisite to its approval, *a fair and equitable arrangement to protect the interests of the said* employees.[9]

On March 30, 1939, Senator Wheeler and Senator Truman introduced S. 2009 which contained essentially the same language. The chairman of the Committee of Six was Carl R. Gray, Vice-Chairman of the Board of Directors, Union Pacific Railroad. The following coloquy is excerpted from Mr. Gray's testimony before the House Committee on Interstate and Foreign Commerce on the Committee's recommendations. It is relevant here because it sheds light on the meaning of the words "employees affected."

Mr. Martin. Mr. Chairman

The Chairman. Mr. Martin

Mr. Martin. *Mr. Gray, is your committee considering measures for the protection of employees who would be displaced by consolidations and mergers?* (Emphasis added.)

Mr. Gray. We do not have any disagreement about that Mr. Martin. We have a complete understanding with respect to it and throughout our report here we have provided that there should be protection for the employees displaced.

Mr. Martin. Is it proposed to do that by submitting legislation for the consideration of the committee, or how?

Mr. Gray. My judgment is that in the consolidation feature that will be included in some form.[10]

The Chairman. Mr. Youngdahl.

Mr. Youngdahl. *Mr. Gray, in connection with the suggested consolidation program, do you believe that it will create a further unemployment problem in the railroad industry?*

Mr. Gray. It will have that effect, and it ought to be done when it is done to a great extent possibly on rising stages of business, Mr. Youngdahl.

Mr. Youngdahl. In answer to one of Mr. Maples' questions you said something must be done for the men whether it is voluntary or involuntary.

I presume you refer to whether the consolidations are voluntary are [sic] involuntary?

Have you any suggestions as to what might be done for the men under consolidations?

Mr. Gray. Yes. We have had no difficulties in handling that separability with the men.

---

8. Hearings before the Senate Committee on Interstate Commerce on S. 1310, 2016, 1869 and 2009. 76th Cong. 1st Sess. 3–5 (1939).

9. Hearings before the House Committee on Interstate and Foreign Commerce on

H.R. 2531, 76th Cong., 1st Sess., p. 275 (1939).

10. Hearings before the House Committee on Interstate and Foreign Commerce on H.R. 2531, 76th Cong., 1st Sess. p. 184 (1939).

Mr. Youngdahl. You refer to your ability to furnish jobs.

Mr. Gray. *We have a basis of compensation for men who are displaced and men who are disadvantaged by a consolidation or coordination.*[11]

(Emphasis added.)

The testimony of Mr. Gray makes clear that when the Committee of Six recommended statutory language to "protect the interests of \* \* \* employees" it clearly had in mind those workers who were actually displaced by the consolidation and not the entire class of the carrier's employees.

In the same session of Congress in which § 5(2) (f) was adopted, the concern over the possibility of widespread

displacement of railroad employees as a result of consolidations of facilities was so great that the following amendment was introduced by Rep. Harrington of Iowa.

[No] such transaction [consolidation] shall be approved by the Commission *if such transaction will result in unemployment or displacement of employees of the carrier or carriers, or in the impairment of existing employment rights of said employers.*

(84 Congressional Record p. 9882; July, 1939).

The debate on the Harrington Amendment is too lengthy to be included in the text but excerpts are included in footnote 12.[12] The Harrington Amendment clearly reflects the fact that the question

---

11. Ibid. p. 193.

12. The following are excerpts from the debate on the Harrington Amendment. Congressional Record, Vol. 84 Pt. 9. 9882–9886.

Mr. Harrington. Mr. Chairman, the purpose of my amendment is to safeguard railway labor. We have contended all along, and I again repeat, this bill is essentially in the interest of railroad carriers, the stronger railroad carriers, I should say, and contrary to the interest of weaker roads, the water carriers, the shippers, the public, and, I emphasize right here, *contrary to the interest of the railroad employees.* (Emphasis added.) I realize full well the spendid work of the able gentleman from Ohio (Mr. Crosser) in behalf of the railroad employees' legislation, but I do think he has failed to recognize the dangers inherent in this bill. If you want to pave the way for ghost railroads and ghost railroad towns, if you want the blue envelope or the pink slip going out to 200,000 railroad employees, do not vote for my amendment. *Some of you may be confused by the fact that several of the railroad brotherhoods have endorsed this bill under the mistaken impressions that it protects the interests of the employer and prevents disemployment when consolidations are authorized. My analysis convinces me that the bill simplifies the method of consolidation and does not protect the employee.* (Emphasis added.)

\* \* \* \* \*

Mr. Warren: Mr. Chairman, I rise in support of the amendment offered by the gentleman from Iowa. [Mr. Harrington].

On last Friday, in making the first speech in opposition to this bill, directing the attention of railroad employees to the subject, I said as follows: 'Mark my words, when I say to them as a friend \* \* \* that not one railroad job will this bill create, although it will throw thousands and thousands of others who toil out of employment. Certainly they must realize these coordinations and consolidations and shakedowns will ultimately mean the loss of thousands and thousands of their own jobs.' \* \* \* *Forever there is hanging over them the specter of unemployment.* Men in my own district with at least 20 years of seniority—and I am told that men in other sections with more seniority than that—are today walking the streets without work having to mortgage their homes, seeing no possible chance of returning to their former jobs.

The amendment offered by the gentleman from Iowa [Mr. Harrington] would protect them and would write into this law the protection that every railroad man in the country, regardless of what brotherhood he belongs to, desires. (Emphasis added.)

Mr. Lea. (Speaking in opposition to the Amendment.)

\* \* \* This bill provides for voluntary consolidation. It is not compulsory. The economic conditions, we thought, did not justify compulsory consolidation but only consent of those

about which Congress was most concerned in this area was loss of employment and methods of dealing with this problem. The Amendment prohibited the approval of consolidations where they would result in loss of employment—in short it proposed a job freeze. It was actually passed by the House but eliminated in Conference. It is important here because it demonstrates how far some members of Congress were prepared to go in order to protect workers against displacement. Finally, we note the testimony of George M. Harrison, President of the Railway Labor Executives Association, who recommended the enactment of the Washington Job Protection Agreement into law. Mr. Harrison was clearly under the impression that displaced workers were "affected" within the meaning of the contemplated amendment to § 5 of the Interstate Commerce Act, when he said:

Any employee who is deprived of employment as a result of a co-ordination is entitled to receive 60 percent of his average monthly compensation for varying periods of time based upon length of service with the employer, * * *. (Hearings before the House Committee on Interstate and Foreign Commerce on H.R. 2531, 76th Cong., 1st Sess. p. 241 (1939).)

This Court notes that the Interstate Commerce Commission has acted for many years on this reading of the statute. In Oklahoma Railway Company Trustees Abandonment Of Operation, etc., 257 I.C.C. 177 (1944), the Commission interpreted the phrase "employees affected" as relating to workers displaced. At page 193 of its opinion the Commission noted that:

* * * Oklahoma is willing to make agreements for the protection of the interests of its *employees who are displaced or dismissed as a result of the*

*transactions,* incorporating therein the substance of the conditions imposed by the Commission for the protection of employees. * * *

For these reasons the defendants' arguments on the proper interpretation of § 5(2) (f) are rejected.

Another argument raised by the defendants, is that the arbitration provisions of the Washington Job Protection Agreement are limited in scope to such matters as "the determination of an employee's displacement allowance, earnings to be offset, or the period of payment of the allowance." They argue that the dispute here falls outside the scope of the arbitration provisions. I find that the defendants' views as to the scope of those provisions is unnecessarily restrictive. See Arnold v. Louisville and Nashville R. R., supra; Batts v. Louisville and Nashville Railroad Co., 316 F.2d 22 (6 Cir. 1963); New Orleans and Northeastern Railroad Co. v. Bozeman, 312 F.2d 264 (5 Cir. 1963); Louisville and Nashville Railroad Co. v. Cantrell, 215 F.Supp. 229 (M.D.Tenn.1962); Chicago and North Western Railway Co. v. Brotherhood of Locomotive Engineers, D.C., 202 F.Supp. 277, aff'd. Brotherhood of Locomotive Engineers v. Chicago and Northwestern Railroad Co., 314 F.2d 424 (8 Cir. 1963).

If the defendants' view is correct, then some other method would have to be devised to determine the conditions under which employees would be entitled to receive allowances. The defendants have not suggested any other explanation to this Court as to how this would be accomplished. The cases cited above confirm that the arbitration provisions were intended to have wider scope. In Brotherhood of Locomotive Engineers v. Chicago and Northwestern Railroad Co., supra, the Court held that the arbi-

---

concerned. The railroad unions have an agreement with most of the class I railroads by which they are cared for during a period of five years to cover unemployment due to a consolidation. *It is estimated that ordinarily those who are discharged on account of con-*

*solidations will be taken care of for 5 years either through a pension system that has been established by this agreement or because of the normal release of labor which will provide places for a part of those who would lose their positions.*

tration provisions were intended to be utilized to determine the "procedures to be followed in adjusting seniority rights of employees affected by consolidation of railroad yards." In *Arnold* and *Batts,* supra, the issue for arbitration was, whether certain discharges were the result of a merger or were caused by "loss of business, general economic decline, and other reasons not related to the merger." In *Bozeman,* supra, the defendant contended that the employee terminations were due to an improvement in operations, yet, the Court found this question meet for arbitration. Once again the objections raised by the defendants must be rejected.

The defendants also argue that the Washington Job Protection Agreement provisions do not apply where an employee is deprived of his employment because of age. Thus, they argue that the retirement agreements preclude the application of those provisions here. Section 7 of the Job Protection Agreement on which the defendants rely reads in part as follows:

(j) A coordinating allowance shall cease prior to the expiration of its prescribed period in the event of:

1. Failure without good cause to return to service in accordance with working agreement after being notified of position for which he is eligible and as provided in paragraphs (g) and (h).

2. Resignation.

3. Death.

4. Retirement on pension or on account of age or disability in accordance with the current rules and practices applicable to employees generally.

The crucial phrase is that which begins "in accordance with the current rules and practices applicable to employees generally." Clearly, the reference to "retirement * * * in accordance with current rules and practices" refers to those rules which are already in effect when the protective conditions are imposed. The protective conditions were imposed in 1961, however, the retirement agreements were not sanctioned by the unions until January of 1962. Obviously then the retirement agreements were not "current" and section 7(j) (4) of the Agreement does not apply to the instant action.

After a careful study of the question I conclude that this Court has the power to order arbitration of this dispute. There have not been many reported cases in which the federal courts have ordered arbitration under the protective conditions as imposed by the I.C.C. *Bozeman,* supra, was such a case as was the *Brotherhood of Locomotive Engineers* case. The Court, in *Bozeman,* observed that:

Turning now to the meaning of the original language touching on arbitration, we think the language could hardly be plainer that the Commission order intended to give either party affected by the acquisition the absolute right to refer any dispute of the nature here in issue to arbitration. It says, the dispute 'may be referred, by either party, to an arbitration committee for consideration and determination.' It would be meaningless for the order to provide that the appellees may refer the dispute to arbitration if such provision were to be construed as also meaning that such election could be defeated by the refusal of the appellant to acquiesce. *The language plainly means that either party may make an election, binding on the other, to refer this dispute to arbitration.* (312 F.2d at p. 268, emphasis added.)

It is significant that in the *Arnold* case, on which the defendants rely, the Court dismissed the complaint because, in its judgment, the plaintiffs' remedy was arbitration.

The history of Interstate Commerce Commission orders is convincing evidence that compulsory arbitration was intended in this case. In scores of cases involving merges [sic] and consolidations, the Commission has followed the practice of prosecuting arbitration as a method of settling disputes between affected employers and car-

riers and, so far as the Court can determine, the Commission's authority to do so has never been questioned. This long continued administrative practice is indicative of congressional approval. (180 F.Supp. at p. 436).

Arbitration will be ordered in this cause on the question of whether the plaintiffs were discharged as a consequence of the abandonment and consolidation of the defendants' facilities.

## VI.

Having concluded that arbitration should be ordered in the instant action it will be necessary to determine the composition of the arbitration panel. Such a course is necessary because at the time the I.C.C. imposed the protective conditions, which are in dispute here, no provisions were made for the composition of such a panel. Thus, although the defendants accepted the provisions of the Washington Job Protection Agreement, as amended (See Oklahoma Railway Co. Trustees Abandonment, 257 I.C.C. 177 (1944); and New Orleans Union Passenger Terminal Case, 282 I.C.C. 271 (1952)) and therefore consented to arbitration, the mechanics of the process are unresolved.

The plaintiffs argue that since the unions entered into an agreement hostile to them they [the unions] should have no representation on any panel convened to resolve the dispute. They contend that only the carriers and themselves are entitled to representation and that both parties should then select a neutral member. The resolution of this issue depends on the meaning of the following passage in the *Oklahoma* and *New Orleans* conditions:

In the event that any dispute or controversy arises which * * * cannot be settled by the carriers and the employee, or his authorized representatives, within 30 days after the controversy arises, it may be referred, by either party, to an arbitration committee for consideration and determination, *the formation of which committee, its duties, procedure, expenses,* *etc., shall be agreed upon by the carriers and the employee, or his duly authorized representatives.* (257 I.C.C. 177, 200; emphasis added.)

The plaintiffs contend that their right to be represented on the panel in their own right is confirmed by the words "shall be agreed upon by the carriers and the employee, or his duly authorized representatives." They maintain that when the employees' interests are antagonistic to those of their "authorized representatives" the employees have a right to be represented, to the exclusion of their unions. This argument is not an implausible one, however, for the reasons which follow I must disagree with the plaintiffs.

In Louisville and Nashville Railroad Co. v. Cantrell, supra, the employees argued that it "would be unfair and an impairment of their rights to be required to submit their claims for protective benefits to an arbitration committee concerning which they were denied any right of choice in its formation"—which is precisely the position of the plaintiffs here. The Court, in *Cantrell*, admitted that it had no precedent to guide it in arriving at a decision, however, it found an analogy in the National Railroad Adjustment Board. It noted that in effect the various divisions of that body are actually "nothing more than arbitration boards" whose membership is comprised of representatives of the carriers and unions. The following passage from the *Cantrell* opinion is relevant here:

Counsel for defendants has argued that it is inconceivable after Congress had authorized and required the Commission to provide 'a fair and equitable arrangement' to protect the employees that the Commission could lawfully provide for arbitration before a committee about whose membership the employee had no voice. We submit that the Railway Labor Act is a forceful expression of what Congress regards to be fair and equitable concerning the selection of an arbitration board and the Supreme Court has not

only upheld the exclusive jurisdiction of the Board but commented upon the wisdom of Congress in providing for such a Board. (215 F.Supp. 229, at p. 237.)

Both the *Cantrell* opinion and the I.C.C. in its brief submitted to this Court on the same question, pointed out that the words "duly authorized representative" are used not only in the *Oklahoma* and *New Orleans* conditions but also in § 5(2)(f) of the Interstate Commerce Act and that they should have the same meaning.

> There can be no reasonable doubt when the Interstate Commerce Commission referred to 'duly authorized representative' in Condition 8 of the Oklahoma Conditions, that term, as referred to by the Commission, has precisely the same meaning as Congress intended it to have when Congress referred to that term in Section 5(a) (f), the very statute under which the Interstate Commerce Commission imposed the protective conditions. Surely, the Commission did not intend for the words 'duly authorized representative' to be construed to mean an attorney or some other type of representative with whom such agreements must be made when the Supreme Court of the United States had previously held in the Virginian Railway case, supra, (Virginian Railway Co. v. System Federation, No. 40,300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789) that when an employee had a duly authorized representative as provided by the Railway Labor Act, the carrier had an affirmative duty to make agreements with that duly authorized representative only and was forbidden to enter into agreements with any other representative (at page 239).

We agree with the Court in *Cantrell* that the intention of the Commission was to provide for direct representation of the individual employee only where he had no authorized representative. The issue was put most aptly in *Cantrell* when the Court said:

> The question in the present cases is not whether the individual employees shall have a voice in the settlement of their own claims; nor do the cases involve a destruction or impairment of vested or accrued rights. The crucial issue is as to the proper method to be followed in determining claims of individual employees by arbitration; in other words, the setting up of the arbitration machinery itself. As the Court views the matter, it was the intention of the Interstate Commerce Commission and the intention of Congress, as expressed in the Interstate Commerce Act, *that such arbitration machinery should be provided for by the carrier and by the unions certified to represent employees under the Railway Labor Act, or by the carrier and the individual employee himself, where such employee was not represented by such a collective bargaining agent.* (at p. 240; emphasis added.)

 It is my judgment that the arbitration panel shall be composed of representatives of the unions and the railroads. The railroads as a class and the unions as a class shall be entitled to one representative each. The third member of the panel will be named by agreement of the two other representatives.

This Court recognizes that the arguments made by the plaintiffs as to why the unions should be excluded from the arbitration phase of this controversy are not totally lacking in merit. The resolution of this issue was not without difficulty. However, it considers itself bound by the apparent intent of Congress and the interpretation given to § 5(2) (f) by the Interstate Commerce Commission. It should be noted that although the unions were a party to the retirement agreements, the validity of those agreements will not be at issue before the arbitration panel. Rather, that panel must decide only if the plaintiffs' discharge came about as a result of a consolidation of the defendants' facilities. There has been no proof of malice or bias on the part of the unions toward the plaintiffs; and we cannot presume that they will

fail to appoint an arbitrator who will give the plaintiffs a fair hearing.

▇ It is of course open to the plaintiffs to return to this Court should they be denied due process before the arbitration panel—an occurrence which we do not anticipate. By this we do not intend to suggest that the decision of the arbitration panel will necessarily be open to attack on the merits. We state only that the parties are entitled to an unprejudiced tribunal which will afford them the fair and impartial hearing and decision that due process requires. If in the administrative proceedings there has been a denial of due process, there is a right to a judicial review of the administrative decision. Hornsby v. Dobard, 291 F.2d 483 (5 Cir. 1961); Ellerd v. Southern Pacific Railroad Co., 241 F.2d 541 (7 Cir. 1957); Sigfred v. Pan American World Airways, 230 F.2d 13 (5 Cir. 1956), cert. denied 351 U.S. 925, 76 S.Ct. 782, 100 L.Ed. 1455 (1956).

The motions of the defendants for summary judgment or in the alternative a dismissal for failure to state a claim for which relief may be granted are denied. The request of the plaintiffs for an order compelling arbitration is granted.

This opinion is filed in accordance with my order of December 30, 1966, which noted, inter alia:

"In accordance with an opinion which will be filed, the parties must, within ninety (90) days after receipt of said opinion:

"(1) Arrive at the composition of the arbitration panel, in accordance with the opinion.

"(2) File with this Court any suggestions which they might have as to payment of any costs related to the arbitration, including the cost of the 'independent arbitrator.'

"This Court retains jurisdiction over all aspects of this case necessary to implement this order compelling arbitration, including the granting of additional relief."