CHICAGO AND NORTH WESTERN RAILWAY COMPANY, a corporation, Plaintiff,

v.

BROTHERHOOD OF LOCOMOTIVE ENGINEERS, an unincorporated association, et al., Defendants.

Civ. No. 4–1159.

United States District Court
S. D. Iowa,
Central Division.

Feb. 2, 1962.

Carl McGowan and Jordan Jay Hillman, Chicago, Ill., and Frank W. Davis, of Davis, Huebner, Johnson, Burt & Fulton, Des Moines, Iowa, for plaintiff.

V. Craven Shuttleworth, Harry E. Wilmarth, Charles A. Hastings and William R. Shuttleworth, of Elliott, Shuttleworth

& Ingersoll, Cedar Rapids, Iowa, for defendants.

STEPHENSON, Chief Judge.

Plaintiff, Chicago and North Western Railway Company, (North Western) brought this action against defendants, Brotherhood of Locomotive Engineers, Brotherhood of Locomotive Firemen and Enginemen, Brotherhood of Railroad Trainmen, Switchmen's Union of North America, AFL–CIO, all unincorporated associations, and various officials of each of said associations as officials of said associations and individually. Plaintiff seeks declaratory judgment as authorized by Title 28 U.S.C. § 2201 and § 2202, declaring the rights of the parties with respect to a controversy which has arisen regarding the lawful procedures to be followed in the coordination and consolidation of plaintiff's existing and newly acquired railroad yards in Marshalltown, Iowa.

In brief, plaintiff contends that the procedures governing personnel changes contemplated in the consolidation of railroad yards at Marshalltown, Iowa, are prescribed in a stipulation executed by the North Western and the defendants and authorized by the Interstate Commerce Commission as a part of its order approving plaintiff's acquisition of the properties and franchises of the Minneapolis & St. Louis Railway Company (M. & St. L.). Defendants contend the personnel changes contemplated involve seniority rights and other changes in rules that are contractual rights which can only be changed under procedures prescribed by the Railway Labor Act (45 U.S.C.A. § 151 et seq.).

North Western is a common carrier by railroad engaged in interstate commerce, and as such is subject to the provisions of the Interstate Commerce Act. Defendant associations are labor organizations, national in scope, each of which serves as the collective bargaining representative for certain of North Western's employees who may be effected by the proposed unification of North Western's old and newly acquired (M. & St. L.) railroad yards in Marshalltown, Iowa. Individual defendants named in plaintiff's complaint are various officers, representatives or agents of defendant organizations, whose duties relate to the representation of North Western employees, including those of the former M. & St. L.

The Interstate Commerce Commission pursuant to its authority under Section 5 of the Interstate Commerce Act (49 U.S.C.A. § 5) approved and authorized the purchase by North Western of the properties and franchises of the M. & St. L. (hereinafter referred to as the Merger) by formal order entered on October 13, 1960.[1] Pursuant to said order North Western acquired all of the railroad properties of M. & St. L., and effective November 1, 1960, said M. & St. L. ceased to exist as a common carrier.

Section 5(2)(f) of the Interstate Commerce Act (49 U.S.C.A. § 5(2)(f)) provides that in its approval of any unification transaction under said section "the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected." In accordance with this obligation the Commission found as follows:

"Applicants also entered into a stipulation[2] with railway labor organizations represented by the Railway Labor Executives' Association for the protection of all employees of the applicants whose bargaining representatives are members of the association. The stipulation is of the character contemplated by section 5(2)(f) of the act for the protection of railway employees who may be adversely affected by the transaction authorized. As to the employees covered by the stipulation, no conditions in our order are necessary. As to employees of the applicants not covered by the afore-

1. Interstate Commerce Commission Finance Docket 21115.

2. Filed with the Commission in Finance Docket 21115.

said stipulation, we will prescribe for their protection conditions similar to those set forth in Oklahoma Ry. Co. Trustees Abandonment, 257 I.C.C. 177." [3]

The stipulation (hereinafter referred to as the "stipulation") was executed by North Western, M. & St. L. and by the Railway Labor Executives Association, acting as the duly designated representatives of the four defendant labor organizations, as well as others. The "stipulation" provides: [3a]

"That in the event the Interstate Commerce Commission shall grant the authority requested in Finance Docket No. 21115, the Commission may accept this agreement as one providing a fair and equitable arrangement for the protection of the interests of such employes as provided in Section 5(2) (f) of the Interstate Commerce Act, as amended."

The "stipulation" also provided:

"It is mutually agreed as follows:

"That the Agreement of May, 1936, Washington, D. C., commonly referred to as the Washington Job Protection Agreement, is hereby adopted and shall be applied for the protection of employees of the above-named carriers who may be adversely affected by Interstate Commerce Commission approval of the applications or petitions in the proceedings designated as Finance Docket No. 21115, the primary object of which is the merger of the carriers named above, with the following modifications: * * * "

Pertinent portions of the Washington Job Protection Agreement as incorporated in the "stipulation" provide as follows:

"Section 1. That the fundamental scope and purpose of this agreement is to provide for allowances to defined employees affected by co-ordination as hereinafter defined, and it is the intent that the provisions of this agreement are to be restricted to those changes in employment in the Railroad Industry solely due to and resulting from such coordination. * * * "

"Section 2(a). The term 'coordination' as used herein means joint action by two or more carriers whereby they unify, consolidate, merge or pool in whole or in part their separate railroad facilities or any of the operations or services previously performed by them through such separate facilities."

"Section 5. Each plan of coordination which results in the displacement of employes or rearrangement of forces shall provide for the selection of forces from the employes of all the carriers involved on bases accepted as appropriate for application in the particular case; and any assignment of employes made necessary by a coordination shall be made on the basis of an agreement between the carriers and the organizations of the employes affected, parties hereto. In the event of failure to agree, the dispute may be submitted by either party for adjustment in accordance with Section 13."

The "stipulation" further provides:

"2. Section 13 is deleted and the following inserted in lieu thereof:

"In the event any dispute or controversy arises (including disputes described in Section 5 but excepting those defined in Section 11) with respect to the protection afforded by this agreement, including an interpretation, application or enforcement of any of its provisions which cannot be settled by the carrier or carriers and the employe, or his authorized representative, within 30 days after the dispute arises, it

---

3. It is agreed that employees involved herein are covered by the stipulation.

3a. Excerpts from the "stipulation" indicating the type of protection afforded employees are set out in the appendix.

may be referred by either party to an arbitration committee, for consideration and determination. Upon notice in writing served by one party on the other of intent by that party to refer the dispute or controversy to an arbitration committee, each party shall, within 10 days, select one member of the arbitration committee and the two members thus chosen shall select a third member who shall serve as chairman. Should the two members be unable to agree upon the appointment of the third member within 10 days, either party may request the National Mediation Board to appoint the third member. The decision of the majority of the arbitration committee shall be final and conclusive."

Prior to November 1, 1960, each company, by virtue of its separate identity, conducted its own switching operations at Marshalltown, Iowa, over and in its own separate yard tracks and facilities.

North Western handled its switching in its Marshalltown yard through a single yard engine assigned to one 8-hour shift 5 days each week. Plaintiff's employees at this yard consisted of the following classes and numbers: One engineer, represented for collective bargaining purposes by the Brotherhood of Locomotive Engineers; one fireman, represented by the Brotherhood of Locomotive Firemen and Enginemen; one yard foreman and two yard helpers, each represented by the Brotherhood of Railroad Trainmen. The engineer and fireman held seniority in their respective crafts over the east-subdivision of plaintiff's Iowa Division, which included its Marshalltown yards. The yard foreman and helpers held seniority in their respective crafts in all of plaintiff's yards on its Iowa Division.

M. & St. L. handled its larger Marshalltown yard switching operations through the assignment of yard engines covering two 8-hour shifts, one shift covering 6 days, and the other 7 days, each week. The following classes and number of employees were assigned to each shift: One engineer, represented for collective bargaining purposes by the Brotherhood of Locomotive Engineers; one fireman, represented by the Brotherhood of Locomotive Firemen and Enginemen; and one yard foreman and two yard helpers, represented by the Switchmen's Union of North America, AFL–CIO. Each of the engineers and firemen held seniority in their respective crafts on all M. & St. L. lines of railroad south of Albert Lea, Minnesota, to Peoria, Illinois. Seniority of the yard foreman and helpers was limited to the Marshalltown yards. In addition to these employees, there was also assigned to a single 8-hour shift, 6 days each week, a yardmaster, represented by the Railroad Yardmasters of America, a labor organization not involved in this controversy.

Section 4 of the Washington Job Protection Agreement as incorporated in the "stipulation" prescribed the notice requirements in the case of each proposed coordination. By the posting of notice thereunder dated December 16, 1960, North Western advised all employees who might be affected "that the C&NW contemplates coordinating yard operations at Marshalltown * * * effective not earlier than March 17, 1961." It was further advised that it was contemplated that all Marshalltown yard operations would be placed under the jurisdiction of the M. & St. L. Division superintendent and that, in effect, yard assignments would include the entire combined yards without being limited to one or the other of the separate yards belonging to either North Western or M. & St. L. prior to the purchase transaction. The notice also stated that " * * * it was contemplated that the coordination will result in the abolishment of 1 yard engine assignment (1 engineer, 1 fireman, 1 foreman and 2 helper assignments)." By letter of December 13, 1960 to the representatives of the employees involved, to which letter was also attached a copy of the notice to be posted on December 16th, North

Western requested a conference on the proposed coordination in accordance with said Section 4.

Following the service of this notice a controversy developed between the North Western and the defendants as to the manner of processing the proposed coordination. The defendants insisted that North Western's notice of the proposed coordination consisted of a Section Six Notice under the Railway Labor Act (Title 45 U.S.C.A. § 156),[4] or that the notice was a violation of the Railway Labor Act. North Western denied it had submitted a Section Six Notice and insisted that the proposed coordination be processed under the provisions of the "stipulation" (Washington Job Protection Agreement, as amended) entered into by the parties and authorized by the order of the Interstate Commerce Commission approving the merger. A conference was held on January 12, 1961 at which time the position of each of the parties remained unchanged. Thereafter North Western notified the defendants of its intent to submit the dispute to arbitration under the terms of the "stipulation",[5] and on April 5, 1961 notified defendants of the identity of the arbitrator designated by North Western. On April 7, 1961 North Western received a telegram from the National Mediation Board warning it of a threatened strike by North Western's employees represented by defendants, Brotherhood of Locomotive Firemen and Enginemen, and Brotherhood of Railroad Trainmen. Thereafter, North Western requested that the National Mediation Board designate a

neutral arbitrator, as provided for in the "stipulation". On May 18, 1961 a conference was held at the request of the National Mediation Board which was not productive.

As a result of this dispute North Western's yards at Marshalltown are conducted as separate operations with the same arrangement of labor forces that existed before the Merger. On July 14, 1961 North Western brought this action for declaratory judgment in which it seeks a declaration of the rights of the parties with respect to the foregoing controversy over the lawful procedures to be followed in the coordination and consolidation of its railroad yards in Marshalltown, Iowa.

■ The controversy between the parties hereinbefore set out involves the interpretation of the effect of Section 5(11) of the Interstate Commerce Act (49 U.S.C.A. § 5(11)) upon the order of the Interstate Commerce Commission approving the Merger, which includes as a part thereof the stipulation entered into by the parties herein for the protection of employees as contemplated by Section 5 (2) (f) of the Act (49 U.S.C.A. § 5(2) (f). Jurisdiction of the matter now before the court is conferred by Title 28 U.S.C., § 1337. Such being the case, diversity of citizenship and jurisdictional amount are not essential. Mulford v. Smith, 307 U.S. 38, 46, 59 S.Ct. 648, 83 L.Ed. 1092.

Defendants originally in a motion to dismiss herein, objected to venue on the ground that since they are unincorpo-

---

4. Title 45 U.S.C.A. § 156 is as follows: "Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with

reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."

5. Supra, page 280.

rated associations, venue may be laid against them under Title 28 U.S.C. § 1391 (b) only in the judicial district where they all "reside", and that the place of such residence is the place where their principal office and place of business is located, which is concededly in Cleveland, Ohio, and Buffalo, New York. This court overruled defendants' contention in this regard, citing American Airlines, Inc. v. Airline Pilot's Ass'n., Inc., 169 F.Supp. 777 (S.D.N.Y.1958). Thereafter the plaintiff herein amended its complaint to remove its prayer for damages and the defendants withdrew their objection to venue.

■ An actual controversy exists between the parties and the request for declaratory judgment declaring the rights of the parties herein should be granted. (28 U.S.C. § 2201).

The basic question presented herein is, whether the parties are required to follow the procedures of the Railway Labor Act (45 U.S.C.A. § 151 et seq.) in effecting the proposed coordination of North Western's railroad yards at Marshalltown, Iowa, or whether the parties are required to follow the procedures prescribed by the "stipulation" entered into by the parties and authorized by the Interstate Commerce Commission in its order approving the merger under the provision of Section 5(2) (f) and Section 5(11) of the Interstate Commerce Act, 49 U.S.C.A. § 5(2) (f), 5(11).

North Western contends that under the provisions of Section 5(11)[6] of the Interstate Commerce Act (49 U.S.C.A. § 5 (11) .), the merger, approved by the Interstate Commerce Commission pursuant to Section 5(2) of the same act (49 U.S.C.A. § 5(2)), may be carried into effect free from any restraints and limitations of the Railway Labor Act and contracts entered into thereunder. Defendants contend that provisions of the Railway Labor Act are not a "restraint" or a "limitation" or a "prohibition" within the purview of Sec. 5(11) of the Interstate Commerce Act; further that Section 5 (11) only purports to relieve the railroad of "restraints" or "limitations" or "prohibitions" of law and does not purport to relieve the railroad of its contractual obligations; and finally that the merger which the Commission approved was permissive only, that it did not direct the North Western, nor did it direct the employees or their representatives to do anything.

■ It is conceded that North Western's proposed unification of the railroad yards at Marshalltown involves seniority rights. Seniority rights arise and exist by virtue of collective bargaining agreements. Aeronautical Industrial District Lodge v. Campbell, 337 U.S. 521, 526, 69 S.Ct. 1287, 93 L.Ed. 513 (1949); Starke v. New York, Chicago & St. Louis R. Co., 180 F.2d 569 (7 Cir. 1950); Fagan v. Pennsylvania R. Co., 173 F.Supp. 465

---

**6.** 49 U.S.C.A. § 5(11) is as follows: "The authority conferred by this section shall be *exclusive and plenary,* and any carrier or corporation participating in or resulting from any transaction approved by the Commission thereunder, shall have full power * * * to carry such transaction into effect and to own and operate any properties and exercise any control or franchises acquired through said transaction without invoking any approval under State authority; and any carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section shall be and *they are· relieved from the operation of the antitrust laws and of all other restraints,* *limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved* or provided for in accordance with the terms and conditions, if any, imposed by the Commission, and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction. Nothing in this section shall be construed to create or provide for the creation, directly or indirectly, of a Federal corporation, but any power granted by this section to any carrier or other corporation shall be deemed to be in addition to and in modification of its powers under its corporate charter or under the laws of any State." (Emphasis added)

(D.C.Penn.1959). In the railroad industry such seniority rights are confined to specified divisions of the railroad and employees on one division do not hold seniority on other divisions. See, Gaskill v. Roth, 151 F.2d 366 (8 Cir. 1945).

■■ It has been held that contractual rights granted preferred stockholders under State law must yield to the plenary and exclusive authority of the Interstate Commerce Commission to approve a merger agreement under the Interstate Commerc Act. (49 U.S.C.A. §§ 5, 20a). Schwabacher v. United States, 334 U.S. 182, 68 S.Ct. 958, 92 L.Ed. 1305 (1947). The controlling consideration in approving mergers and consolidations is the public interest and the Commission may authorize a carrier to abandon facilities within a State even though the State laws prohibit the same. Texas v. United States, 292 U.S. 522, 54 S.Ct. 819, 78 L. Ed. 1402 (1934). It is abundantly clear that under Section 5(11) (49 U.S.C.A. § 5(11) ) the Commission has the power to exempt railroads from the operation of State laws under a Section 5 proceeding. Seaboard Air Line R. Co. v. Daniel, 333 U.S. 118, 68 S.Ct. 426, 92 L.Ed. 580 (1948).

It has also been held that the Civil Aeronautics Board under Federal legislation authorizing it to approve mergers (49 U.S.C.A. § 488) may, as a part of said approval, impose conditions which conflict with an existing collective bargaining contract establishing seniority rights. In Kent v. Civil Aeronautics Board, 204 F.2d 263, 266 (2 Cir. 1953) cert denied 346 U.S. 826, 74 S.Ct. 46, 98 L.Ed. 351, the court said:

"A private contract must yield to the paramount power of the Board to perform its duties under the statute creating it to approve mergers and transfers of certificates, such as are here involved, only upon such terms as it determines to be just and reasonable in the public interest."

Defendants contend that the authority of the Commission to approve mergers under the law (49 U.S.C.A. § 5) is permissive only and its grant of permission has no effect on contractual rights and obligations. St. Joe Paper Co. v. Atlantic Coast Line R. Co., 347 U.S. 298, 299, 74 S.Ct. 574, 98 L.Ed. 710 (1954); Regents of the University System of Georgia v. Carroll, 338 U.S. 587, 70 S.Ct. 370, 94 L.Ed. 363 (1950). Defendants further contend that in any event the proposed consolidation involved changes in contracts which could only be brought about under the procedures of the Railway Labor Act (45 U.S.C.A. § 151 et seq.). Order of R. R. Telegraphers v. Chicago & N. W. R. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1959); City of Nashville Tennessee v. United States, D.C., 155 F.Supp. 98, aff. in 355 U.S. 63, 78 S.Ct. 142, 2 L.Ed.2d 106 (1957).

■ It is the view of the court that under the circumstances of this case the parties hereto in carrying out the consolidation of yards are relieved from the requirements of the Railway Labor Act by virtue of Section 5(11) of the Interstate Commerce Act (49 U.S.C.A. § 5 (11) ). To hold otherwise would do violence to a plain reading of the statute. The parties entered into a stipulation pertaining to the protection of the interests of the employees of the merging railroads which the Commission found "is of the character contemplated by Section 5(2) (f) of the Act for the protection of railway employees who may be adversely affected by the transaction authorized." [7] To now require the North Western to comply with the provisions of the Railway Labor Act is to deprive it of the benefits of compulsory arbitration agreed to by the parties in the "stipulation". While the Railway Labor Act provides for negotiations, it does not compel agreement. Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western R. Co., 321 U.S. 50, 64 S.Ct. 4, 13, 88 L.Ed. 534 (1944). Under defendants' contentions they may veto the economies proposed by North Western in the merger plan even though the defendants agreed

7. Supra page 279.

by stipulation as part of the merger to submit the problem of displacement or rearrangement of employees to eventual compulsory arbitration. Defendants' contention that "Section 5(11) is obviously designed solely for the purpose of authorizing one railroad to acquire another free of prohibitions of state law or Federal anti-trust statutes which otherwise might prohibit or make illegal such an acquisition", cannot be sustained. No such limitation can be found in the words of the statute.

Defendants further contend that there is no judicial authority to interpret and apply collective agreements negotiated between railroads and their employees. Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 (1950); Order of Railway Conductors v. Southern Railway, 339 U.S. 255, 70 S.Ct. 585, 94 L.Ed. 811 (1950); that this court, therefore, is without authority to interpret or apply any of the agreements before it, including the "stipulation", which incorporates the Washington Job Protection Agreement. Defendants' contention in this regard, ignores the gist of the controversy herein. The problem is not one of interpretation of collective agreements, but as heretofore set out, primarily involves the interpretation and effect of Section 5(11) of the Interstate Commerce Act on an agreement for the protection of employees approved by the Interstate Commerce Commission under Section 5(2) of the Act.

The foregoing shall constitute the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.

ORDER

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED as follows:

1. That the Railway Labor Act (45 U.S.C.A. § 151 et seq.) is inapplicable to the proposed coordination of plaintiff's Marshalltown railroad yards.

2. The parties hereto in carrying out the proposed coordination are required to follow the procedures prescribed by the stipulation entered into on August 4, 1960 and filed in Finance Docket No. 21115 before the Interstate Commerce Commission.

"APPENDIX

"Section 6(a). No employee of any of the carriers involved in a particular coordination who is continued in service shall, for a period not exceeding five years following the effective date of such coordination, be placed, as a result of such coordination, in a worse position with respect to compensation and rules governing working conditions than he occupied at the time of such coordination so long as he is unable in the normal exercise of his seniority rights under existing agreements, rules and practices to obtain a position producing compensation equal to or exceeding the compensation of the position held by him at the time of the particular coordination, except however, that if he fails to exercise his seniority rights to secure another available position, which does not require a change in residence, to which he is entitled under the working agreement and which carries a rate of pay and compensation exceeding those of the position which he elects to retain, he shall thereafter be treated for the purposes of this section as occupying the position which he elects to decline.

"(b) *   *   *

"(c) *   *   *

"Section 7. Section 7(a), that portion of Section 7(d) specifying a three-year period and Section 7(i) are deleted and the following inserted in their stead:

"A. If as a result of the merger (hereinafter referred to as the coordination), any employe, hereinafter referred to as a dismissed employe, of the carriers is deprived of employment with said carriers, he shall be accorded a monthly coordination allowance equivalent to one-twelfth of the compensation received by him in the last 12 months of his employment in which he earned compensation prior to the date he is first deprived of employment as a result of the coordination. This allowance shall be made dur-

ing the protective period to each dismissed employe while unemployed.

"B. The coordination allowance of any dismissed employe shall be reduced by the amount of his combined monthly earnings in other employment, plus any benefits received under any unemployment insurance law. Such employe, or his representative, and the carriers, should agree upon a procedure by which the carriers shall be currently informed of the wages earned by such employee in employment other than with the carriers, and the benefits received.

"C. The period during which this protection is to be given, herein called the protective period, shall extend from the date on which the employe is dismissed to the expiration of 4 years from the effective date of the coordination; provided, that such protection shall not continue for a longer period following the effective date of the coordination than the period during which such employe was in the employ of the carriers prior to the effective date of the coordination.

"D. * * *
"(b) * * *
"(c) * * *
"(d) * * *
"(e) * * *
"(f) * * *
"(g) * * *
"(h) * * *
"(j) * * *
"Section 8. * * *

"Section 9. Any employee eligible to receive a coordination allowance under section 7 hereof may, at his option at the time of coordination, resign and (in lieu of all other benefits and protections provided in this agreement) accept in a lump sum a separation allowance determined in accordance with the following schedule:

| Length of Service | Separation Allowance |
|---|---|
| 1 year & less than 2 years | 3 months' pay |
| 2 years " " 3 " | 6 " " |
| 3 years " " 5 " | 9 " " |
| 5 ". " " 10 " | 12 " " |
| 10 " " " 15 " | 12 " " |
| 15 years and over | 12 " " |

"In the case of employees with less than one year's service, five days' pay, at the rate of the position last occupied, for each month in which they performed service will be paid as the lump sum.

"(a) Length of service shall be computed as provided in Section 7.

"(b) One month's pay shall be computed by multiplying by 30 the daily rate of pay received by the employee in the position last occupied prior to time of coordination.

"Section 10(a). Any employee who is retained in the service of any carrier involved in a particular coordination (or who is later restored to service from the group of employees entitled to receive a coordination allowance) who is required to change the point of his employment as result of such coordination and is therefore required to move his place of residence, shall be reimbursed for all expenses of moving his household and other personal effects and for the traveling expenses of himself and members of his family, including living expenses for himself and his family and his own actual wage loss during the time necessary for such transfer, and for a reasonable time thereafter, (not to exceed two working days), used in securing a place of residence in his new location. * * *"