**EMPLOYEES PROTECTIVE ASSOCIATION, Appellant,**

v.

**NORFOLK AND WESTERN RAILWAY COMPANY, Brotherhood of Locomotive Engineers, and Special Board of Adjustment No. 813, Appellees.**

**No. 76-1996.**

United States Court of Appeals, Fourth Circuit.

Argued April 4, 1977.

Decided Dec. 6, 1977.

William G. Anderson, Roanoke, Va. (George V. Gardner and Gardner & Ambrister, Washington, D. C., on brief), for appellant.

Harold A. Ross, Cleveland, Ohio and Martin M. Lucente, Chicago, Ill. (Ross & Kraushaar Co., Cleveland, Ohio, G. Marshall Mundy, Mundy & Garrison, William B. Poff, Bayard E. Harris, Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., and Sidley & Austin, Washington, D. C., on brief), for appellees.

Before BRYAN, Senior Circuit Judge, and CRAVEN* and WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

This is the second time this case has been before this court. In 511 F.2d 1040 (1975), we reversed the action of the district court[1] in dismissing plaintiff's complaint for lack of jurisdiction over the subject matter of the case. We remanded the case to the district court "for the limited purpose of

---

* Circuit Judge CRAVEN participated in the decision of this case but died before the opinion was prepared. 28 U.S.C. § 46(d).

1. 375 F.Supp. 684 (1974).

deciding whether Board No. 813 exceeded its jurisdiction in making the award under attack in this case." The issue is more specifically stated in appellants' brief as follows: "Appellants' [Employees Protective Association, et al (the Association)] position is that the Board lacked jurisdiction altogether, inasmuch as there was no unresolved dispute or controversy for it to resolve. The precise issue submitted by the Appellee, Norfolk and Western Railway (hereinafter called the N&W), to arbitration process had been specifically settled by agreement approximately 13 years earlier, at the time of the merger between the N&W and the Virginian Railway Company (hereinafter called the Virginian). That issue or question, namely, whether the language of Section 1(a) of the Merger Protection Agreement executed in 1959, at the time of said merger, empowered the N&W to compel integration of seniority rosters of protected employees, was specifically resolved by agreement between Mr. Gilbert, then International President of the Brotherhood of Locomotive Firemen & Engineers [sic, Enginemen], acting on behalf of all affected operating employees, and the N&W's president, Stuart T. Saunders, that the railroad would not attempt to force the operating employees to merge their seniority rosters. The only matter for this court to determine now is whether appellants sufficiently proved this agreement by a preponderance of the evidence presented in the hearing on November 25 and 26, 1975. Clearly, if appellants have proven that this precise issue had been settled by agreement, there was no longer a dispute for settlement by arbitration."

The district court held that Arbitration Board No. 813 did not exceed its jurisdiction. We affirm, but not for the same reasons as were stated by the district court.

2. BLF & E was later consolidated with other unions into the United Transportation Union (UTU).

3. The Washington Job Protection Agreement of 1936 is an agreement entered into by most railroads and most unions representing railway labor to protect employees from the adverse effects of mergers and consolidations. It is

*Securities and Exchange Commission v. Chenery,* 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

I

On April 6, 1959, the Norfolk and Western Railway Company (N&W) and the Virginian Railway Company (Virginian) jointly petitioned the Interstate Commerce Commission for permission to merge the Virginian into the N&W. At that time the employees of the N&W were represented by Brotherhood of Locomotive Engineers (BLE) and some or all of the employees of the Virginian were represented by the former Brotherhood of Locomotive Firemen and Enginemen (BLF & E).[2]

The Railway Labor Executives Association (RLEA) opposed the merger. RLEA is an organization composed of the chief executives of some 15 or more unions representing various crafts in the transportation field. Both BLE and BLF & E were represented in RLEA. Because of this opposition, the N&W, Virginian and RLEA negotiated an agreement "for the protection of employees as result of merger of Norfolk & Western Railway Company and Virginian Railway Company." This protective agreement was executed June 18, 1959. As a result of the agreement, RLEA withdrew its opposition to the merger.

The protective agreement of June 18, 1959 gave railroad employees more protection than previously afforded. In prior mergers, most railroad employees affected were protected by the Washington Job Protection Agreement of 1936.[3] That agreement gave protection for only five years, while the protective agreement of June 18, 1959 gave personnel employed at the time of merger protection until the age of 65.

discussed in *United States v. Lowden,* 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208 (1939), *Brotherhood of Loc. Eng. v. Chicago & North Western Ry. Co.,* 314 F.2d 424, at 427, fn. 1 (8th Cir. 1963), and *Chicago & N. W. Ry. Co. v. Brotherhood of Locomotive Eng.,* 202 F.Supp. 277 (S.D.Ia.1962), among other cases.

For this controversy, the pertinent part of the June 18, 1959 agreement is paragraph 1(a).[4] Although that paragraph is set forth in its entirety in the margin, the portion which relates to the issue in this case, i. e., the integration of seniority rosters, is as follows:

". . . in the event that the employee organizations . . . elect not to have presently working employees of either railroad occupy available positions on the merged railroad through integration of seniority rosters . . . then, in that event, said employees shall be entitled only to . . . protection afforded by the terms of the Washington Job Protection Agreement . . ."

Some of the witnesses for the N&W claim that that company's right to compel integration of seniority rosters is established by the above quoted language.[5]

In 1962, another merger was accomplished between the N&W and the Nickel Plate railroad, which merger is described and discussed in our earlier opinion. Following are two pertinent paragraphs (511 F.2d 1040, at 1042):

"In 1962 N&W sought ICC approval of a second merger with the New York, Chicago and St. Louis Railroad (Nickel Plate). Since the 1959 Agreement would not protect N&W employees (including former Virginian employees) from consequences attributable to the Nickel Plate merger, RLEA and the two carriers entered into an Agreement for Protection of Employees, which included an arbitration provision, set out in the margin.

"As a result of the 1962 Agreement N&W employees were subject to two different sets of merger-protective provisions, the applicable protection depending upon whether the adverse employment effect

---

4. 1. The provisions of the Washington Job Protection Agreement of 1936, a copy of which is attached hereto, will be applied for the protection of all employees of both the Norfolk & Western and the Virginian who may be adversely affected with respect to their rates of pay, rules, or working conditions, or rights or privileges pertaining thereto upon approval and effectuation of the said merger and related transactions; provided, however, that in addition to the benefits provided by the said Washington Job Protection Agreement, it is further agreed as follows:

(a) On the effective date of the said merger, the Norfolk & Western will take into its employment all employees of the Virginian who are willing to accept such employment, and none of the present employees of either of said carriers shall be deprived of employment or placed in a worse position with respect to compensation at any time during his employment because of the merger of the said railroads or any program of economies undertaken by the Norfolk & Western because of the merger including, but not specifically limited to, installation of centralized traffic control, mechanized maintenance of way work, modernization of equipment programs, abandonment or curtailment of existing facilities and shops, relocation of maintenance and repair work, changes in any existing work now performed on the Norfolk & Western or Virginian pursuant to existing agreements, changes pursuant to any integration of employment forces, or other such economies or changes resulting from the merger; provided, however, that all presently working employees of the Virginian and the Norfolk & Western shall be entitled to the foregoing

preservation of employment, and, provided further, that in the event the employee organizations at their option elect not to have presently working employees of either railroad occupy available positions on the merged railroad through integration of seniority rosters without liability to furloughed employees who may be affected by such integration of seniority rosters, then, in that event, said employees shall be entitled only to compensatory benefits and other protection afforded by the terms of the Washington Job Protection Agreement in lieu of preservation of their employment. . . .

5. It will be noted that the quoted language does not explicitly give N&W the power to integrate seniority rosters against the will of the unions representing its employees. It provides that if any unions object, the employees that they represent lose the additional protection afforded by the June 18, 1959 agreement and are limited to the protection given by the Washington Job Protection Agreement of 1936. The argument is that the 1936 Washington agreement grants protection for only five years and that since, at the time integration was proposed, the employees had enjoyed the greater protection of the 1959 agreement for more than five years, the quoted provisions of 1(a) gave N&W a right to integrate the seniority rosters. This was the basis upon which Special Arbitration Board 813 eventually predicated N&W's right to compel arbitration. See footnote 14, infra. The argument presented by N&W in its brief, and advanced by Board 813 in its interim decision, is more sophisticated.

could be traced to the Virginian or the Nickel Plate merger. Therefore, a Memorandum of Understanding was executed, which provided, inter alia, that the arbitration provisions of the 1962 Agreement would be controlling."

The especially pertinent provision of the protective agreement of January 10, 1962 is as follows:

"1(b) In consideration of the foregoing employee benefits, Norfolk and Western and the other carriers heretofore named shall be entitled to transfer the work of the employees protected hereunder throughout the merged or consolidated system and the labor organizations will enter into implementing agreements providing for the transfer of employees to follow their work, and the employees, their organizations and the carriers will cooperate to that end."

The memorandum of understanding executed the same day as the protective agreement provides:

"It is understood and agreed that the said agreement [1962 Nickel Plate Protective Agreement] does not diminish the rights and benefits of the employees subject to the Agreement of June 18, 1959, or implementing agreements made thereto in the Norfolk and Western—Virginian merger case except that said Agreement effective January 10, 1962, shall apply with respect to arbitration, retraining of employees and transfer of work."

Before the Board and in this court, the N&W has also claimed its power to integrate justified by the last two quoted provisions.[6]

The Association claims that an oral agreement or understanding was reached between H. E. Gilbert, representing RLEA and Stuart T. Saunders, President of N&W, to the effect that no integration of seniority rosters would be required, at least for operating crafts. Gilbert was the Association's principal witness at the trial in the district court. In 1959, he was president of BLF & E and represented RLEA in its original opposition to the N&W—Virginian merger and in negotiating the protective agreement of June 18, 1959.

The Association sought to prove this Gilbert-Saunders agreement by the testimony of Gilbert and by various BLF & E memoranda and correspondence. Gilbert testified that he first voiced his objection to paragraph 1(a) of the June 18, 1959 agreement, insofar as it might require integration of seniority rosters, before that agreement was signed. He explained that under the BLF & E Constitution no agreement could be made which involves integration of seniority rosters without a vote of the membership of the union. Gilbert testified that his first understanding with Saunders was on June 16, 1959. It also appears from Gilbert's testimony and from correspondence and memoranda that a meeting occurred in Washington, D. C., on December 14, 1959, which was attended by Saunders and two other N&W officers and by representatives of RLEA, and seven unions, including BLE and BLF & E. At that time, Saunders recognized his conversation of June 16, 1959 and agreed that modification would be made. This Gilbert-Saunders understanding was referred to as a gentlemen's agreement which was carried out by long practice over many years.

In December 1959 and in March and April 1960, at least five agreements were made with representatives of various groups of employees. Some of these involved integration of seniority rosters and were concurred in by union representatives who considered that they were putting paragraph 1(a) of the June 18, 1959 agreement into

6. In our prior decision (511 F.2d 1040, at 1042), we refer to the 1962 merger as being between the N&W and Nickel Plate. The evidence now before us sometimes refers to this 1962 merger as between the N&W and Nickel Plate, and, at other places refers to it as though the Wabash Railroad were also involved. Although the arbitration provisions in the 1962 protection agreement are applicable to disputes arising under the 1959 agreement, it is difficult to, and we do not, perceive any significant difference between the arbitration provisions in the two agreements, at least any difference which would be relevant to the question we decide in this case.

effect. However, for 13 years intervening between 1959 and 1972, no attempt was made to integrate the seniority rosters of engineers.[7] Both mergers were approved by the Interstate Commerce Commission.[8] The ICC Report, at p. 439, expressly referred to the protective agreement of June 18, 1959 and found, at p. 441, that that agreement constituted compliance with Section 5(2)(f) of the Interstate Commerce Act[9] by subjecting the findings to the agreement. Richard Keene, general solicitor for N&W, testified that he examined the transcript of evidence in the Interstate Commerce Commission proceeding and found no reference to the Gilbert-Saunders agreement.

On September 5, 1972, the N&W took steps to obtain integration of seniority rosters of engineers, represented by BLE and Trainmen, Firemen, and Conductors represented by UTU.[10] On October 3, 1972, R. B. Curtis, representing BLE, requested that in the future the N&W meet with BLE separately from the representative of UTU. On October 11, 1972, he served notice in writing denying the validity of the N&W's demand to integrate, contending that integration was not required under either the June

18, 1959 agreement or the January 10, 1962 agreement. On October 17, 1972, the N&W served notice to arbitrate, and on October 23, 1972, BLE declined to arbitrate. On October 26, 1972, N&W requested the National Mediation Board to take jurisdiction and to assign a neutral arbitrator as chairman. On November 3, 1972, BLE filed a response with the National Mediation Board in which it objected to arbitration on the ground that the dispute ". . . does not involve the mere interpretation or application of a collective agreement. Rather, it involves a question of law, which an arbitrator lacks the power to decide." On February 2, 1973, the Federal Mediation Board created Special Board of Adjustment No. 813, and appointed C. Robert Roadley as the neutral member. The Mediation Board specifically stated that the appointment was made without prejudice to the right of BLE to submit its objection to the arbitration procedure to the Board.[11]

R. B. Curtis, who was BLE's principal representative in the proceedings prior to the appointment of Special Adjustment Board No. 813, served as the organization representative on that board. Curtis testi-

---

7. On December 1 and 3, 1959, agreements were made with BLE regarding engineers, and on March 5 and April 27, 1960, agreements relating to conductors, brakemen, and trainmen were made. The engineers involved here, however, did not have their seniority roster consolidated.

8. The N&W—Virginian merger was approved on October 8, 1959. Finance Doc. 20599, 307 I.C.C. 401. The Nickel Plate merger was approved in 324 I.C.C. 1 (1964).

9. 49 U.S.C. § 5(2)(f), provides:

"As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee

pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this Act, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees."

The Interstate Commerce Commission order approving the Nickel Plate merger also found that Section 5(2)(f) had been complied with. See *Norfolk & Western Ry. Co. v. Nemitz*, 404 U.S. 37, at 40, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971).

10. UTU is the successor to BLF & E. See footnote 2, supra.

11. On July 17, 1973, the National Mediation Board created Special Board of Adjustment No. 820 to arbitrate the N&W's integration request of September 5, 1972, as it related to the employees represented by UTU.

fied that in the Board proceedings he objected to the Board's jurisdiction along the same lines as he had previously objected. He did not assign the Gilbert-Saunders agreement as a basis for his objection to jurisdiction. He testified that his reason for this omission was that he had no knowledge of such agreement, and that the agreement first came to his attention after the termination of the activities of Board 813 and while Board 820 [12] was in progress.

Special Board of Adjustment No. 813 rendered two decisions. On April 25, 1973, it announced its opinion and made its interim

award. The Board held that it had jurisdiction, under the terms of the arbitration provisions of the 1959 and 1962 agreements, to consider the carrier's demand for integration.[13] It ordered, however, that the parties first attempt to resolve the issue by negotiation. The attempted negotiation failed, and then Board No. 813 filed its final opinion and award on November 19, 1973. In this award, the Board decided that, under the authority of Section 1(a) of the protective agreement of June 18, 1959, the carrier (N&W) was entitled to force integration.[14] Board 813, however, rejected the

12. See fn. 11, supra.

13. Actually, the Board recognized two issues: (1) whether the carrier could process its integration notice under the terms of paragraph 1(a) of the agreement of June 18, 1959 and paragraph 1(b) of the agreement of January 10, 1962; (2) whether the issue outlined under (1) is subject to arbitration under paragraph 1(d) of the 1959 agreement as amended by the 1962 agreement. Although the Board did discuss the substantive rights of the carrier, seemingly it only decided the jurisdictional issue. The Board states:

"Consequently, this Board finds that the proper procedure has been followed insofar as the disputed Carrier Notice is concerned and, further, that the issue described in such Notice is subject to final and binding arbitration upon failure of the parties to reach a negotiated settlement, and that this Board is the duly constituted arbitration committee."

14. Following are the pertinent provisions of the award:

"The Carrier has proposed that the three seniority rosters of engineers for the road districts east of Roanoke be consolidated by means of a 'dovetailing' of the names of engineers in the order of their present seniority dates to comprise a single roster. The organization disagreed and averred that nothing in the merger agreements requires that seniority rosters be consolidated, or that if consolidated said rosters must be merged on a strict seniority date basis. Numerous citations were presented by the Organization in support of its position together with a detailed reference to the BLE Constitution and By-Laws as it applies to situations of this nature. The Carrier replied with references to Section 1(a) of the 1959 Merger Agreement, and this reference is quoted below, in pertinent part:

'(a) On the effective date of the said merger, the Norfolk & Western will take into its employment all employees of the Virginian who are willing to accept such employment, and none of the present employees of either of

said carriers shall be deprived of employment or placed in a worse position with respect to compensation at any time during his employment because of the merger of said railroads or any program of economies undertaken by the Norfolk & Western because of the merger including, but not specifically limited to, * * changes pursuant to any integration of employment forces, or other such economies or changes resulting from the merger; provided, however, that all presently working employees of the Virginian and the Norfolk & Western shall be entitled to the foregoing preservation of employment and, provided further, that in the event that the employee organizations at their option elect not to have presently working employees of either railroad occupy available positions on the merged railroad through integration of seniority rosters without liability to furloughed employees who may be affected by such integration of seniority rosters, then, in that event, said employees shall be entitled only to compensatory benefits and other protection afforded by the terms of the Washington Job Protection Agreement in lieu of preservation of their employment.'

The Board sees in the above language a definite intention that the employees of either railroad occupy available positions on the merged railroad through integration of seniority rosters or forfeit their rights to preservation of employment. The Organization has been unable to refute that implied obligation."

It is evident from the above quotation that the Board predicated the N&W's right to integration upon section 1(a) of the agreement of June 18, 1959, as stated at footnote 6, supra. So far as the issue is discussed in the interim decision of the Board, its decision is also based upon section 1(b) of the agreement of January 10, 1962. The following quotation is from the interim decision:

"Having carefully reviewed and considered the testimony and submissions of the parties, it is the opinion of this Board that the follow-

basis for integration demanded by the carrier, i. e., that all engineers on any of the three lists east of Roanoke be integrated into a composite list and appear on the merged list according to date of seniority on the respective lists, called dovetailing. Instead, it ordered the alternate basis for integrating asked by BLE which was called "percentage equity allocation."

The Association's suit is essentially one brought under 28 U.S.C. § 1337 to set aside the award of Special Board of Adjustment No. 813.[15] Its sole basis of attack upon the award is as indicated at the beginning of this opinion, that the Gilbert-Saunders agreement deprived the Board of jurisdiction. But the N&W denied the existence of the Gilbert-Saunders agreement, and the district judge was not convinced that such agreement has been established. He thus found that Special Board of Adjustment No. 813 did have jurisdiction.

■ Assuming that the evidence sustains the existence of the Gilbert-Saunders agreement, we do not concur with the Association as to the legal effect of that agreement. Its entire argument is based upon the premise that that agreement removed the entire issue of integration of seniority rosters of engineers from the scope of the arbitration clause. This understanding would not, and could not, do that, absent a modification of the arbitration clause itself, which is not even claimed. We express no opinion as to whether this agreement could have the effect of amending section 1(a) of the 1959 protective agreement or section 1(b) of the 1962 protective agreement. That it might have such an effect is an argument that must be addressed to the arbitration board. Its decisions on such matters are generally final. The same remarks apply as to whether the Gilbert-Saunders agreement should be considered an implementing agreement under the protective provisions.

■ The Association correctly contends that an arbitrator's decision is binding only as to matters that the parties have agreed to submit to arbitration. However, the scope of an arbitrator's authority is to be determined by an inspection of the arbitration clause. In *Steelworkers v. Warrier & Gulf Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), one of the famous Trilogy Cases,[16] the Court states on page 582, 80 S.Ct. on page 1353;

". . . Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

ing enumerated citations and conclusions are controlling in our consideration of the issue before us:

    *   *   *   *   *   *

2. Section 1(b) of the 1962 Merger Protection Agreement states that '. . . the labor organization will enter into implementing agreements providing for the transfer of employees to follow their work . . .' Also, '. . . it is further agreed that implementing agreements will be negotiated to permit the assignments of employees who do not follow their work . . .'"

15. The procedural antecedents of this appeal are stated in the earlier opinion of the district court in 375 F.Supp. 684 and in our opinion on the prior appeal in 511 F.2d 1040. It appears that the Association's originally asserted grounds for relief were somewhat more extensive than now relied upon.

16. As is apparent, the cases we rely on as to the scope of an arbitrator's jurisdiction are cases decided under the National Labor Relations Act, and not cases decided under the Railway Labor Act. Such is true generally, however, of the authorities relied upon by the parties. There is no suggestion that different rules apply to the scope of the jurisdiction of a Special Board of Adjustment than do to that of an arbitrator appointed pursuant to the terms of a collective bargaining agreement negotiated under the National Labor Relations Act.

"We do not agree with the lower courts that contracting-out grievances were necessarily excepted from the grievance procedure of this agreement. To be sure, the agreement provides that 'matters which are strictly a function of management shall not be subject to arbitration.' But it goes on to say that if 'differences' arise or if 'any local trouble of any kind' arises, the grievance procedure shall be applicable."

The Association's argument that there is no dispute to present to an adjustment board is unconvincing. Section 1(d) of the 1962 agreement provides for arbitration of any "dispute or controversy . . . with respect to the interpretation or application of any provision of this agreement." The 1959 agreement provides the same in all essential respects. Certainly there is here both a dispute regarding the application of section 1(a) of the 1959 agreement and section 1(b) of the 1962 agreement.

■ But, the Association argues, the integration of seniority rosters was removed from the scope of both arbitration clauses · by the Gilbert-Saunders agreement. Even if we assume that the parties did attempt to settle the issue, otherwise arbitrable, by agreement, any disagreement as to the existence or effect of that settlement agreement would itself be a matter for the arbitrator to decide.

Several of the leading cases on the scope of an arbitrator's authority deal with attempts to limit the coverage of an arbitration clause otherwise than by a limitation in the clause itself. In *Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), another of the Trilogy Cases, an employee had been injured and his claim for workmen's compensation settled by the employer on the basis the employee was 25% permanently partially disabled. As a result of the settlement, the employer refused to take the employee back to work and refused to arbitrate his reinstatement claim upon the ground that the grievance had been removed from the arbitration clause by settlement of the compensation claim on the basis of permanent dis-

ability. The employee claimed reinstatement, saying he was not disabled, contrary to the claim he asserted in his settlement. The Supreme Court ordered arbitration, and on pages 567 and 568, 80 S.Ct. on pages 1346 the Court stated:

"The collective agreement calls for submission of grievances in the categories which it describes, irrespective of whether a court may deem them to be meritorious. . . . The function of the Court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator . . ."

We think the *American Manufacturing* reasoning should apply here. In that case, it was contended that a claim which on its face raised an issue under a contract provision was removed from the scope of the arbitration clause because of a settlement agreement. Here, there is no doubt that, but for the claimed effect of the Gilbert-Saunders agreement, the issue as to the applicability of section 1(a) of the 1959 agreement or 1(b) of the 1962 agreement would be appropriate for arbitration. We think the Gilbert-Saunders agreement is, in principle, not different from the settlement agreement in *American Manufacturing*.

■ We also think applicable the case of *Operating Engineers v. Flair Builders, Inc.*, 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1971). In that case, the company resisted a union's demand to arbitrate an issue which fell within the scope of the arbitration clause, as written, on the ground that the union's right to arbitration had been lost by laches. In rejecting the claim that the laches question should be decided by the court, the Court stated, on pp. 491, 492, 92 S.Ct. on p. 1712:

"We need not reach the question posed by petitioner, for we find that the parties did in fact agree to arbitrate the issue of

laches here. Although respondent denies that it ever signed a binding contract with petitioner, the District Court found to the contrary and held that the company 'was bound by the memorandum agreement to arbitrate labor disputes within the limits of the arbitration clause.' That clause applies to 'any difference,' whatever it may be, not settled by the parties within 48 hours of occurrence. There is nothing to limit the sweep of this language or to except any dispute or class of disputes from arbitration. In that circumstance, we must conclude that the parties meant what they said—that 'any difference,' which would include the issue of laches raised by respondent at trial, should be referred to the arbitrator for decision. The District Court ignored the plain meaning of the clause in deciding that issue.

".  .  .  But once a court finds that, as here, the parties are subject to an agreement to arbitrate, and that agreement extends to 'any difference' between them, then a claim that particular grievances. are barred by laches is an arbitrable question under the agreement.  .  .  ."

Of course the issue in *Operating Engineers v. Flair Builders, Inc.,* is not exactly the same as the issue now before us because there the arbitration clause referred to "any difference," whereas here reference is to "any dispute or controversy  .  .  . with respect to the interpretation or application of any provision of this agreement." [17] The decision is significant for its showing that the coverage of an arbitration clause is to be determined from the wording of the clause itself, and not from something else which may have occurred which is pertinent to the issues to be submitted to the arbitrator.

■ The issue as to the existence and legal effect of the Gilbert-Saunders agreement was pertinent to the application of sections 1(a) of the 1959 agreement and 1(b) of the 1962 agreement. It should, therefore, have been submitted to Special Adjustment Board No. 813.˙ That issue is not pertinent to the scope of the arbitrator's authority as found in the arbitration clause, sections 1(d) of both agreements.

We are not unmindful that evidence as to the Gilbert-Saunders agreement was apparently not submitted to the Adjustment Board because BLE was not aware of such evidence at that time. It does appear, however, that the issue as to whether the N&W had the power to compel the integration of seniority rosters under the terms of the two agreements was extensively submitted to Adjustment Board No. 813.[18] We think the question was clearly within the scope of the arbitration clause for it is "with respect to the interpretation or application of .  . [a] provision of  .  .  .  [the] agreement."

Because of the ground on which we have based our decision, it is not necessary for us to express an opinion on the other principal points raised in the appeal. The Association argues persuasively that the finding that the Gilbert-Saunders agreement did not exist, having been carried out by the parties for about 13 years, is clearly erroneous. The Norfolk & Western argues strenuously that under the case of *Nemitz v. Norfolk & Western Ry. Co.,* 404 U.S. 37, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971), the Gilbert-Saunders agreement, assuming its existence, could have no effect because it was a modification of the employee protective agreements and had not received the approval of the ICC.

We express no opinions on these questions. However, we do believe we should indicate that by our affirmance we do not express any opinion that the findings of fact of the district court, that the Gilbert-

---

17. The quotation is from section 1(d) of the 1962 agreement, but the wording of section 1(d) of the 1959 agreement is substantially the same. Section 4 of a Memorandum of Understanding between the N&W and various unions provides that the 1962 agreement applies with respect to arbitration.

18. See fn. 14, supra, for a quotation from the Board's opinion which shows that the issue was presented.

Saunders agreement did not exist, are correct. By the same token, our affirmance should not be taken as expressing any opinion that *Nemitz* might not preclude the enforcement of the Gilbert-Saunders agreement in all events.

Because we believe Special Board of Adjustment No. 813 did not exceed its jurisdiction, the judgment of the district court is

*AFFIRMED.*